## CENTRAL BANK OF DENVER, N. A. *v.* FIRST INTERSTATE BANK OF DENVER, N. A., ET AL.

No. 92–854.   Argued November 30, 1993—Decided April 19, 1994

KENNEDY, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and O'CONNOR, SCALIA, and THOMAS, JJ., joined. STEVENS, J., filed a dissenting opinion, in which BLACKMUN, SOUTER, and GINSBURG, JJ., joined, *post*, p. 192.

*Tucker K. Trautman* argued the cause for petitioner. With him on the briefs was *Van Aaron Hughes.*

*Miles M. Gersh* argued the cause for respondents. With him on the brief was *James S. Helfrich.*

*Edwin S. Kneedler* argued the cause for the Securities and Exchange Commission as *amicus curiae* urging affirmance. With him on the brief were *Solicitor General Days, Paul Gonson, Jacob H. Stillman,* and *Brian D. Bellardo.**

JUSTICE KENNEDY delivered the opinion of the Court.

As we have interpreted it, § 10(b) of the Securities Exchange Act of 1934 imposes private civil liability on those who commit a manipulative or deceptive act in connection with the purchase or sale of securities. In this case, we

---

*\*Theodore B. Olson, Theodore J. Boutrous, Jr.,* and *William J. Fitzpatrick* filed a brief for the Securities Industry Association as *amicus curiae* urging reversal.

Briefs of *amicus curiae* urging affirmance were filed for the Association of the Bar of the City of New York by *Harvey J. Goldschmid, John D. Feerick, Sheldon H.`Elsen,* and *Jill E. Fisch;* and for the Trial Lawyers for Public Justice, P. C., et al. by *Priscilla R. Budeiri* and *Arthur H. Bryant.*

Briefs of *amici curiae* were filed for the American Institute of Certified Public Accountants by *Louis A. Craco, Richard I. Miller,* and *David P. Murray;* and for the National Association of Securities and Commercial Law Attorneys by *William S. Lerach, Leonard B. Simon, Kevin P. Roddy,* and *Paul F. Bennett.*

must answer a question reserved in two earlier decisions: whether private civil liability under § 10(b) extends as well to those who do not engage in the manipulative or deceptive practice, but who aid and abet the violation. See *Herman & MacLean* v. *Huddleston,* 459 U. S. 375, 379, n. 5 (1983); *Ernst & Ernst* v. *Hochfelder,* 425 U. S. 185, 191–192, n. 7 (1976).

## I

In 1986 and 1988, the Colorado Springs-Stetson Hills Public Building Authority (Authority) issued a total of $26 million in bonds to finance public improvements at Stetson Hills, a planned residential and commercial development in Colorado Springs. Petitioner Central Bank of Denver served as indenture trustee for the bond issues.

The bonds were secured by landowner assessment liens, which covered about 250 acres for the 1986 bond issue and about 272 acres for the 1988 bond issue. The bond covenants required that the land subject to the liens be worth at least 160% of the bonds' outstanding principal and interest. The covenants required AmWest Development, the developer of Stetson Hills, to give Central Bank an annual report containing evidence that the 160% test was met.

In January 1988, AmWest provided Central Bank with an updated appraisal of the land securing the 1986 bonds and of the land proposed to secure the 1988 bonds. The 1988 appraisal showed land values almost unchanged from the 1986 appraisal. Soon afterwards, Central Bank received a letter from the senior underwriter for the 1986 bonds. Noting that property values were declining in Colorado Springs and that Central Bank was operating on an appraisal over 16 months old, the underwriter expressed concern that the 160% test was not being met.

Central Bank asked its in-house appraiser to review the updated 1988 appraisal. The in-house appraiser decided that the values listed in the appraisal appeared optimistic considering the local real estate market. He suggested that

Central Bank retain an outside appraiser to conduct an independent review of the 1988 appraisal. After an exchange of letters between Central Bank and AmWest in early 1988, Central Bank agreed to delay independent review of the appraisal until the end of the year, six months after the June 1988 closing on the bond issue. Before the independent review was complete, however, the Authority defaulted on the 1988 bonds.

Respondents First Interstate Bank of Denver and Jack K. Naber had purchased $2.1 million of the 1988 bonds. After the default, respondents sued the Authority, the 1988 underwriter, a junior underwriter, an AmWest director, and Central Bank for violations of § 10(b) of the Securities Exchange Act of 1934. The complaint alleged that the Authority, the underwriter defendants, and the AmWest director had violated § 10(b). The complaint also alleged that Central Bank was "secondarily liable under § 10(b) for its conduct in aiding and abetting the fraud." App. 26.

The United States District Court for the District of Colorado granted summary judgment to Central Bank. The United States Court of Appeals for the Tenth Circuit reversed. *First Interstate Bank of Denver, N. A.* v. *Pring,* 969 F. 2d 891 (1992).

The Court of Appeals first set forth the elements of the § 10(b) aiding and abetting cause of action in the Tenth Circuit: (1) a primary violation of § 10(b); (2) recklessness by the aider and abettor as to the existence of the primary violation; and (3) substantial assistance given to the primary violator by the aider and abettor. *Id.,* at 898–903.

Applying that standard, the Court of Appeals found that Central Bank was aware of concerns about the accuracy of the 1988 appraisal. Central Bank knew both that the sale of the 1988 bonds was imminent and that purchasers were using the 1988 appraisal to evaluate the collateral for the bonds. Under those circumstances, the court said, Central Bank's awareness of the alleged inadequacies of the updated,

but almost unchanged, 1988 appraisal could support a finding of extreme departure from standards of ordinary care. The court thus found that respondents had established a genuine issue of material fact regarding the recklessness element of aiding and abetting liability. *Id.*, at 904. On the separate question whether Central Bank rendered substantial assistance to the primary violators, the Court of Appeals found that a reasonable trier of fact could conclude that Central Bank had rendered substantial assistance by delaying the independent review of the appraisal. *Ibid.*

Like the Court of Appeals in this case, other federal courts have allowed private aiding and abetting actions under § 10(b). The first and leading case to impose the liability was *Brennan* v. *Midwestern United Life Ins. Co.*, 259 F. Supp. 673 (ND Ind. 1966), aff'd, 417 F. 2d 147 (CA7 1969), cert. denied, 397 U. S. 989 (1970). The court reasoned that "[i]n the absence of a clear legislative expression to the contrary, the statute must be flexibly applied so as to implement its policies and purposes." 259 F. Supp., at 680–681. Since 1966, numerous courts have taken the same position. See, *e. g., Cleary* v. *Perfectune, Inc.*, 700 F. 2d 774, 777 (CA1 1983); *Kerbs* v. *Fall River Industries, Inc.*, 502 F. 2d 731, 740 (CA10 1974).

After our decisions in *Santa Fe Industries, Inc.* v. *Green*, 430 U. S. 462 (1977), and *Ernst & Ernst* v. *Hochfelder*, 425 U. S. 185 (1976), where we paid close attention to the statutory text in defining the scope of conduct prohibited by § 10(b), courts and commentators began to question whether aiding and abetting liability under § 10(b) was still available. Professor Fischel opined that the "theory of secondary liability [under § 10(b) was] no longer viable in light of recent Supreme Court decisions strictly interpreting the federal securities laws." Secondary Liability Under Section 10(b) of the Securities Act of 1934, 69 Calif. L. Rev. 80, 82 (1981). In 1981, the District Court for the Eastern District of Michigan found it "doubtful that a claim for 'aiding and abetting' . . .

will continue to exist under 10(b)." *Benoay* v. *Decker,* 517 F. Supp. 490, 495, aff'd, 735 F. 2d 1363 (CA6 1984). The same year, the Ninth Circuit stated that the "status of aiding and abetting as a basis for liability under the securities laws [was] in some doubt." *Little* v. *Valley National Bank of Arizona,* 650 F. 2d 218, 220, n. 3. The Ninth Circuit later noted that "[a]iding and abetting and other 'add-on' theories of liability have been justified by reference to the broad policy objectives of the securities acts. . . . The Supreme Court has rejected this justification for an expansive reading of the statutes and instead prescribed a strict statutory construction approach to determining liability under the acts." *SEC* v. *Seaboard Corp.,* 677 F. 2d 1301, 1311, n. 12 (1982). The Fifth Circuit has stated: "[I]t is now apparent that open-ended readings of the duty stated by Rule 10b–5 threaten to rearrange the congressional scheme. The added layer of liability . . . for aiding and abetting . . . is particularly problematic. . . . There is a powerful argument that . . . aider and abettor liability should not be enforceable by private parties pursuing an implied right of action." *Akin* v. *Q–L Investments, Inc.,* 959 F. 2d 521, 525 (1992). Indeed, the Seventh Circuit has held that the defendant must have committed a manipulative or deceptive act to be liable under § 10(b), a requirement that in effect forecloses liability on those who do no more than aid or abet a 10b–5 violation. See, *e. g., Barker* v. *Henderson, Franklin, Starnes & Holt,* 797 F. 2d 490, 495 (1986).

We granted certiorari to resolve the continuing confusion over the existence and scope of the § 10(b) aiding and abetting action. 508 U. S. 959 (1993).

## II

In the wake of the 1929 stock market crash and in response to reports of widespread abuses in the securities industry, the 73d Congress enacted two landmark pieces of securities legislation: the Securities Act of 1933 (1933 Act) and the

Securities Exchange Act of 1934 (1934 Act). 48 Stat. 74, as amended, 15 U. S. C. § 77a *et seq.* (1988 ed. and Supp. IV); 48 Stat. 881, as amended, 15 U. S. C. § 78a *et seq.* (1988 ed. and Supp. IV). The 1933 Act regulates initial distributions of securities, and the 1934 Act for the most part regulates post-distribution trading. *Blue Chip Stamps* v. *Manor Drug Stores,* 421 U. S. 723, 752 (1975). Together, the Acts "embrace a fundamental purpose . . . to substitute a philosophy of full disclosure for the philosophy of *caveat emptor.*" *Affiliated Ute Citizens of Utah* v. *United States,* 406 U. S. 128, 151 (1972) (internal quotation marks omitted).

The 1933 and 1934 Acts create an extensive scheme of civil liability. The Securities and Exchange Commission (SEC) may bring administrative actions and injunctive proceedings to enforce a variety of statutory prohibitions. Private plaintiffs may sue under the express private rights of action contained in the Acts. They may also sue under private rights of action we have found to be implied by the terms of §§ 10(b) and 14(a) of the 1934 Act. *Superintendent of Ins. of N. Y.* v. *Bankers Life & Casualty Co.,* 404 U. S. 6, 13, n. 9 (1971) (§ 10(b)); *J. I. Case Co.* v. *Borak,* 377 U. S. 426, 430–435 (1964) (§ 14(a)). This case concerns the most familiar private cause of action: the one we have found to be implied by § 10(b), the general antifraud provision of the 1934 Act. Section 10(b) states:

> "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—
>
> .          .          .          .          .
>
> "(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U. S. C. § 78j.

Rule 10b–5, adopted by the SEC in 1942, casts the proscription in similar terms:

> "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> "(a) To employ any device, scheme, or artifice to defraud,
>
> "(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> "(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
>
> "in connection with the purchase or sale of any security." 17 CFR § 240.10b–5 (1993).

In our cases addressing § 10(b) and Rule 10b–5, we have confronted two main issues. First, we have determined the scope of conduct prohibited by § 10(b). See, *e. g., Dirks* v. *SEC,* 463 U. S. 646 (1983); *Aaron* v. *SEC,* 446 U. S. 680 (1980); *Chiarella* v. *United States,* 445 U. S. 222 (1980); *Santa Fe Industries, Inc.* v. *Green,* 430 U. S. 462 (1977); *Ernst & Ernst* v. *Hochfelder,* 425 U. S. 185 (1976). Second, in cases where the defendant has committed a violation of § 10(b), we have decided questions about the elements of the 10b–5 private liability scheme: for example, whether there is a right to contribution, what the statute of limitations is, whether there is a reliance requirement, and whether there is an *in pari delicto* defense. See *Musick, Peeler & Garrett* v. *Employers Ins. of Wausau,* 508 U. S. 286 (1993); *Lampf, Pleva, Lipkind, Prupis & Petigrow* v. *Gilbertson,* 501 U. S. 350 (1991); *Basic Inc.* v. *Levinson,* 485 U. S. 224 (1988); *Bateman Eichler, Hill Richards, Inc.* v. *Berner,* 472 U. S. 299 (1985); see also *Blue Chip Stamps, supra; Schlick* v. *Penn-Dixie Cement Corp.,*

507 F. 2d 374 (CA2 1974); cf. *Virginia Bankshares, Inc.* v. *Sandberg,* 501 U. S. 1083 (1991) (§ 14); *Schreiber* v. *Burlington Northern, Inc.,* 472 U. S. 1 (1985) (same).

The latter issue, determining the elements of the 10b–5 private liability scheme, has posed difficulty because Congress did not create a private § 10(b) cause of action and had no occasion to provide guidance about the elements of a private liability scheme. We thus have had "to infer how the 1934 Congress would have addressed the issue[s] had the 10b–5 action been included as an express provision in the 1934 Act." *Musick, Peeler, supra,* at 294.

With respect, however, to the first issue, the scope of conduct prohibited by § 10(b), the text of the statute controls our decision. In § 10(b), Congress prohibited manipulative or deceptive acts in connection with the purchase or sale of securities. It envisioned that the SEC would enforce the statutory prohibition through administrative and injunctive actions. Of course, a private plaintiff now may bring suit against violators of § 10(b). But the private plaintiff may not bring a 10b–5 suit against a defendant for acts not prohibited by the text of § 10(b). To the contrary, our cases considering the scope of conduct prohibited by § 10(b) in private suits have emphasized adherence to the statutory language, " '[t]he starting point in every case involving construction of a statute.' " *Ernst & Ernst, supra,* at 197 (quoting *Blue Chip Stamps,* 421 U. S., at 756 (Powell, J., concurring)); see *Chiarella, supra,* at 226; *Santa Fe Industries, supra,* at 472. We have refused to allow 10b–5 challenges to conduct not prohibited by the text of the statute.

In *Ernst & Ernst,* we considered whether negligent acts could violate § 10(b). We first noted that "[t]he words 'manipulative or deceptive' used in conjunction with 'device or contrivance' strongly suggest that § 10(b) was intended to proscribe knowing or intentional misconduct." 425 U. S., at 197. The SEC argued that the broad congressional purposes behind the Act—to protect investors from false and

misleading practices that might injure them—suggested that § 10(b) should also reach negligent conduct. *Id.*, at 198. We rejected that argument, concluding that the SEC's interpretation would "add a gloss to the operative language of the statute quite different from its commonly accepted meaning." *Id.*, at 199.

In *Santa Fe Industries,* another case involving "the reach and coverage of § 10(b)," 430 U. S., at 464, we considered whether § 10(b) "reached breaches of fiduciary duty by a majority against minority shareholders without any charge of misrepresentation or lack of disclosure." *Id.*, at 470 (internal quotation marks omitted). We held that it did not, reaffirming our decision in *Ernst & Ernst* and emphasizing that the "language of § 10(b) gives no indication that Congress meant to prohibit any conduct not involving manipulation or deception." 430 U. S., at 473.

Later, in *Chiarella,* we considered whether § 10(b) is violated when a person trades securities without disclosing inside information. We held that § 10(b) is not violated under those circumstances unless the trader has an independent duty of disclosure. In reaching our conclusion, we noted that "not every instance of financial unfairness constitutes fraudulent activity under § 10(b)." 445 U. S., at 232. We stated that "the 1934 Act cannot be read more broadly than its language and the statutory scheme reasonably permit," and we found "no basis for applying . . . a new and different theory of liability" in that case. *Id.*, at 234 (internal quotation marks omitted). "Section 10(b) is aptly described as a catchall provision, but what it catches must be fraud. When an allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty to speak." *Id.*, at 234–235.

Adherence to the text in defining the conduct covered by § 10(b) is consistent with our decisions interpreting other provisions of the securities Acts. In *Pinter* v. *Dahl,* 486 U. S. 622 (1988), for example, we interpreted the word "seller" in § 12(1) of the 1933 Act by "look[ing] first at the

language of § 12(1)." *Id.*, at 641. Ruling that a seller is one who solicits securities sales for financial gain, we rejected the broader contention, "grounded in tort doctrine," that persons who participate in the sale can also be deemed sellers. *Id.*, at 649. We found "no support in the statutory language or legislative history for expansion of § 12(1)," *id.*, at 650, and stated that "[t]he ascertainment of congressional intent with respect to the scope of liability created by a particular section of the Securities Act must rest primarily on the language of that section." *Id.*, at 653.

Last Term, the Court faced a similar issue, albeit outside the securities context, in a case raising the question whether knowing participation in a breach of fiduciary duty is actionable under the Employee Retirement Income Security Act of 1974 (ERISA). *Mertens* v. *Hewitt Associates*, 508 U. S. 248 (1993). The petitioner in *Mertens* said that the knowing participation cause of action had been available in the common law of trusts and should be available under ERISA. We rejected that argument and noted that no provision in ERISA "explicitly require[d] [nonfiduciaries] to avoid participation (knowing or unknowing) in a fiduciary's breach of fiduciary duty." *Id.*, at 254. While plaintiffs had a remedy against nonfiduciaries at common law, that was because "nonfiduciaries had a *duty* to the beneficiaries not to assist in the fiduciary's breach." *Id.*, at 255, n. 5. No comparable duty was set forth in ERISA.

Our consideration of statutory duties, especially in cases interpreting § 10(b), establishes that the statutory text controls the definition of conduct covered by § 10(b). That bodes ill for respondents, for "the language of Section 10(b) does not in terms mention aiding and abetting." Brief for SEC as *Amicus Curiae* 8 (hereinafter Brief for SEC). To overcome this problem, respondents and the SEC suggest (or hint at) the novel argument that the use of the phrase "directly or indirectly" in the text of § 10(b) covers aiding and abetting. See Brief for Respondents 15 ("Inclusion of those who act 'indirectly' suggests a legislative purpose fully

consistent with the prohibition of aiding and abetting"); Brief for SEC 8 ("[W]e think that when read in context [§ 10(b)] is broad enough to encompass liability for such 'indirect' violations").

The federal courts have not relied on the "directly or indirectly" language when imposing aiding and abetting liability under § 10(b), and with good reason. There is a basic flaw with this interpretation. According to respondents and the SEC, the "directly or indirectly" language shows that "Congress . . . intended to reach all persons who engage, even if only indirectly, in proscribed activities connected with securities transactions." *Ibid.* The problem, of course, is that aiding and abetting liability extends beyond persons who engage, even indirectly, in a proscribed activity; aiding and abetting liability reaches persons who do not engage in the proscribed activities at all, but who give a degree of aid to those who do. A further problem with respondents' interpretation of the "directly or indirectly" language is posed by the numerous provisions of the 1934 Act that use the term in a way that does not impose aiding and abetting liability. See § 7(f)(2)(C), 15 U. S. C. § 78g(f)(2)(C) (direct or indirect ownership of stock); § 9(b)(2)–(3), 15 U. S. C. § 78i(b)(2)–(3) (direct or indirect interest in put, call, straddle, option, or privilege); § 13(d)(1), 15 U. S. C. § 78m(d)(1) (direct or indirect ownership); § 16(a), 15 U. S. C. § 78p(a) (direct or indirect ownership); § 20, 15 U. S. C. § 78t (direct or indirect control of person violating Act). In short, respondents' interpretation of the "directly or indirectly" language fails to support their suggestion that the text of § 10(b) itself prohibits aiding and abetting. See 5B A. Jacobs, Litigation and Practice Under Rule 10b–5 § 40.07, p. 2–465 (rev. 1993).

Congress knew how to impose aiding and abetting liability when it chose to do so. See, *e. g.*, Act of Mar. 4, 1909, § 332, 35 Stat. 1152, as amended, 18 U. S. C. § 2 (general criminal aiding and abetting statute); Packers and Stockyards Act, 1921, ch. 64, § 202, 42 Stat. 161, as amended, 7 U. S. C. § 192(g)

(1988 ed. and Supp. IV) (civil aiding and abetting provision); see generally *infra*, at 181–185. If, as respondents seem to say, Congress intended to impose aiding and abetting liability, we presume it would have used the words "aid" and "abet" in the statutory text. But it did not. Cf. *Pinter* v. *Dahl*, 486 U. S., at 650 ("When Congress wished to create such liability, it had little trouble doing so"); *Blue Chip Stamps*, 421 U. S., at 734 ("When Congress wished to provide a remedy to those who neither purchase nor sell securities, it had little trouble in doing so expressly").

We reach the uncontroversial conclusion, accepted even by those courts recognizing a § 10(b) aiding and abetting cause of action, that the text of the 1934 Act does not itself reach those who aid and abet a § 10(b) violation. Unlike those courts, however, we think that conclusion resolves the case. It is inconsistent with settled methodology in § 10(b) cases to extend liability beyond the scope of conduct prohibited by the statutory text. To be sure, aiding and abetting a wrongdoer ought to be actionable in certain instances. Cf. Restatement (Second) of Torts § 876(b) (1977). The issue, however, is not whether imposing private civil liability on aiders and abettors is good policy but whether aiding and abetting is covered by the statute.

As in earlier cases considering conduct prohibited by § 10(b), we again conclude that the statute prohibits only the making of a material misstatement (or omission) or the commission of a manipulative act. See *Santa Fe Industries*, 430 U. S., at 473 ("language of § 10(b) gives no indication that Congress meant to prohibit any conduct not involving manipulation or deception"); *Ernst & Ernst*, 425 U. S., at 214 ("When a statute speaks so specifically in terms of manipulation and deception . . . , we are quite unwilling to extend the scope of the statute"). The proscription does not include giving aid to a person who commits a manipulative or deceptive act. We cannot amend the statute to create liability for

acts that are not themselves manipulative or deceptive within the meaning of the statute.

## III

Because this case concerns the conduct prohibited by § 10(b), the statute itself resolves the case, but even if it did not, we would reach the same result. When the text of § 10(b) does not resolve a particular issue, we attempt to infer "how the 1934 Congress would have addressed the issue had the 10b–5 action been included as an express provision in the 1934 Act." *Musick, Peeler*, 508 U. S., at 294. For that inquiry, we use the express causes of action in the securities Acts as the primary model for the § 10(b) action. The reason is evident: Had the 73d Congress enacted a private § 10(b) right of action, it likely would have designed it in a manner similar to the other private rights of action in the securities Acts. See *id.*, at 294–297.

In *Musick, Peeler*, for example, we recognized a right to contribution under § 10(b). We held that the express rights of contribution contained in §§ 9 and 18 of the Acts were "important . . . feature[s] of the federal securities laws and that consistency require[d] us to adopt a like contribution rule for the right of action existing under Rule 10b–5." *Id.*, at 297. In *Basic Inc.* v. *Levinson*, 485 U. S., at 243, we decided that a plaintiff in a 10b–5 action must prove that he relied on the defendant's misrepresentation in order to recover damages. In so holding, we stated that the "analogous express right of action"—§ 18(a) of the 1934 Act— "includes a reliance requirement." *Ibid.* And in *Blue Chip Stamps*, we held that a 10b–5 plaintiff must have purchased or sold the security to recover damages for the defendant's misrepresentation. We said that "[t]he principal express nonderivative private civil remedies, created by Congress contemporaneously with the passage of § 10(b), . . . are by their terms expressly limited to purchasers or sellers of securities." 421 U. S., at 735–736.

Following that analysis here, we look to the express private causes of action in the 1933 and 1934 Acts. See, *e. g.,* *Musick, Peeler, supra,* at 295–297; *Blue Chip Stamps, supra,* at 735–736. In the 1933 Act, § 11 prohibits false statements or omissions of material fact in registration statements; it identifies the various categories of defendants subject to liability for a violation, but that list does not include aiders and abettors. 15 U. S. C. § 77k. Section 12 prohibits the sale of unregistered, nonexempt securities as well as the sale of securities by means of a material misstatement or omission; and it limits liability to those who offer or sell the security. 15 U. S. C. § 77*l.* In the 1934 Act, § 9 prohibits any person from engaging in manipulative practices such as wash sales, matched orders, and the like. 15 U. S. C. § 78i. Section 16 regulates short-swing trading by owners, directors, and officers. 15 U. S. C. § 78p. Section 18 prohibits any person from making misleading statements in reports filed with the SEC. 15 U. S. C. § 78r. And § 20A, added in 1988, prohibits any person from engaging in insider trading. 15 U. S. C. § 78t–1.

This survey of the express causes of action in the securities Acts reveals that each (like § 10(b)) specifies the conduct for which defendants may be held liable. Some of the express causes of action specify categories of defendants who may be liable; others (like § 10(b)) state only that "any person" who commits one of the prohibited acts may be held liable. The important point for present purposes, however, is that none of the express causes of action in the 1934 Act further imposes liability on one who aids or abets a violation. Cf. 7 U. S. C. § 25(a)(1) (1988 ed. and Supp. IV) (Commodity Exchange Act's private civil aiding and abetting provision).

From the fact that Congress did not attach private aiding and abetting liability to any of the express causes of action in the securities Acts, we can infer that Congress likely would not have attached aiding and abetting liability to § 10(b) had it provided a private § 10(b) cause of action. See

*Musick, Peeler, supra,* at 297 ("[C]onsistency requires us to adopt a like contribution rule for the right of action existing under Rule 10b–5"). There is no reason to think that Congress would have attached aiding and abetting liability only to § 10(b) and not to any of the express private rights of action in the Act. In *Blue Chip Stamps,* we noted that it would be "anomalous to impute to Congress an intention to expand the plaintiff class for a judicially implied cause of action beyond the bounds it delineated for comparable express causes of action." 421 U. S., at 736. Here, it would be just as anomalous to impute to Congress an intention in effect to expand the defendant class for 10b–5 actions beyond the bounds delineated for comparable express causes of action.

Our reasoning is confirmed by the fact that respondents' argument would impose 10b–5 aiding and abetting liability when at least one element critical for recovery under 10b–5 is absent: reliance. A plaintiff must show reliance on the defendant's misstatement or omission to recover under 10b–5. *Basic Inc.* v. *Levinson, supra,* at 243. Were we to allow the aiding and abetting action proposed in this case, the defendant could be liable without any showing that the plaintiff relied upon the aider and abettor's statements or actions. See also *Chiarella,* 445 U. S., at 228 (omission actionable only where duty to disclose arises from specific relationship between two parties). Allowing plaintiffs to circumvent the reliance requirement would disregard the careful limits on 10b–5 recovery mandated by our earlier cases.

## IV

Respondents make further arguments for imposition of § 10(b) aiding and abetting liability, none of which leads us to a different answer.

## A

The text does not support their point, but respondents and some *amici* invoke a broad-based notion of congressional

intent. They say that Congress legislated with an understanding of general principles of tort law and that aiding and abetting liability was "well established in both civil and criminal actions by 1934." Brief for SEC 10. Thus, "Congress intended to include" aiding and abetting liability in the 1934 Act. *Id.*, at 11. A brief history of aiding and abetting liability serves to dispose of this argument.

Aiding and abetting is an ancient criminal law doctrine. See *United States* v. *Peoni*, 100 F. 2d 401, 402 (CA2 1938); 1 M. Hale, Pleas of the Crown 615 (1736). Though there is no federal common law of crimes, Congress in 1909 enacted what is now 18 U. S. C. § 2, a general aiding and abetting statute applicable to all federal criminal offenses. Act of Mar. 4, 1909, § 332, 35 Stat. 1152. The statute decrees that those who provide knowing aid to persons committing federal crimes, with the intent to facilitate the crime, are themselves committing a crime. *Nye & Nissen* v. *United States*, 336 U. S. 613, 619 (1949).

The Restatement of Torts, under a concert of action principle, accepts a doctrine with rough similarity to criminal aiding and abetting. An actor is liable for harm resulting to a third person from the tortious conduct of another "if he . . . knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other . . . ." Restatement (Second) of Torts § 876(b) (1977); see also W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts 322–324 (5th ed. 1984). The doctrine has been at best uncertain in application, however. As the Court of Appeals for the District of Columbia Circuit noted in a comprehensive opinion on the subject, the leading cases applying this doctrine are statutory securities cases, with the common-law precedents "largely confined to isolated acts of adolescents in rural society." *Halberstam* v. *Welch*, 705 F. 2d 472, 489 (1983). Indeed, in some States, it is still unclear whether there is aiding and abetting tort liability of the kind set forth in § 876(b) of the Restatement.

See, *e. g., FDIC* v. *S. Prawer & Co.,* 829 F. Supp. 453, 457 (Me. 1993) (in Maine, "[i]t is clear . . . that aiding and abetting liability did not exist under the common law, but was entirely a creature of statute"); *In re Asbestos School Litigation,* No. 83–0268, 1991 U. S. Dist. LEXIS 10471, *34 (ED Pa., July 18, 1991) (cause of action under Restatement § 876 "has not yet been applied as a basis for liability" by Pennsylvania courts); *Meadow Limited Partnership* v. *Heritage Savings and Loan Assn.,* 639 F. Supp. 643, 653 (ED Va. 1986) (aiding and abetting tort based on Restatement § 876 "not expressly recognized by the state courts of the Commonwealth" of Virginia); *Sloane* v. *Fauque,* 239 Mont. 383, 385, 784 P. 2d 895, 896 (1989) (aiding and abetting tort liability is issue "of first impression in Montana").

More to the point, Congress has not enacted a general civil aiding and abetting statute—either for suits by the Government (when the Government sues for civil penalties or injunctive relief) or for suits by private parties. Thus, when Congress enacts a statute under which a person may sue and recover damages from a private defendant for the defendant's violation of some statutory norm, there is no general presumption that the plaintiff may also sue aiders and abettors. See, *e. g., Electronic Laboratory Supply Co.* v. *Cullen,* 977 F. 2d 798, 805–806 (CA3 1992).

Congress instead has taken a statute-by-statute approach to civil aiding and abetting liability. For example, the Internal Revenue Code contains a full section governing aiding and abetting liability, complete with description of scienter and the penalties attached. 26 U. S. C. § 6701 (1988 ed. and Supp. IV). The Commodity Exchange Act contains an explicit aiding and abetting provision that applies to private suits brought under that Act. 7 U. S. C. § 25(a)(1) (1988 ed. and Supp. IV); see also, *e. g.,* 12 U. S. C. § 93(b)(8) (1988 ed. and Supp. IV) (National Bank Act defines violations to include "aiding or abetting"); 12 U. S. C. § 504(h) (1988 ed. and Supp. IV) (Federal Reserve Act defines violations to include

"aiding or abetting"); Packers and Stockyards Act, 1921, ch. 64, §202, 42 Stat. 161, 7 U. S. C. §192(g) (civil aiding and abetting provision). Indeed, various provisions of the securities laws prohibit aiding and abetting, although violations are remediable only in actions brought by the SEC. See, e. g., 15 U. S. C. §78o(b)(4)(E) (1988 ed. and Supp. IV) (SEC may proceed against brokers and dealers who aid and abet a violation of the securities laws); Insider Trading Sanctions Act of 1984, Pub. L. 98–376, 98 Stat. 1264 (civil penalty provision added in 1984 applicable to those who aid and abet insider trading violations); 15 U. S. C. §78u–2 (1988 ed., Supp. IV) (civil penalty provision added in 1990 applicable to brokers and dealers who aid and abet various violations of the Act).

With this background in mind, we think respondents' argument based on implicit congressional intent can be taken in one of three ways. First, respondents might be saying that aiding and abetting should attach to all federal civil statutes, even laws that do not contain an explicit aiding and abetting provision. But neither respondents nor their *amici* cite, and we have not found, any precedent for that vast expansion of federal law. It does not appear Congress was operating on that assumption in 1934, or since then, given that it has been quite explicit in imposing civil aiding and abetting liability in other instances. We decline to recognize such a comprehensive rule with no expression of congressional direction to do so.

Second, on a more narrow ground, respondents' congressional intent argument might be interpreted to suggest that the 73d Congress intended to include aiding and abetting only in §10(b). But nothing in the text or history of §10(b) even implies that aiding and abetting was covered by the statutory prohibition on manipulative and deceptive conduct.

Third, respondents' congressional intent argument might be construed as a contention that the 73d Congress intended to impose aiding and abetting liability for all of the express

causes of action contained in the 1934 Act—and thus would have imposed aiding and abetting liability in § 10(b) actions had it enacted a private § 10(b) right of action. As we have explained, however, none of the express private causes of action in the Act imposes aiding and abetting liability, and there is no evidence that Congress intended that liability for the express causes of action.

Even assuming, moreover, a deeply rooted background of aiding and abetting tort liability, it does not follow that Congress intended to apply that kind of liability to the private causes of action in the securities Acts. Cf. *Mertens,* 508 U. S., at 254 (omission of knowing participation liability in ERISA "appears all the more deliberate in light of the fact that 'knowing participation' liability on the part of *both* cotrustees *and* third persons was well established under the common law of trusts"). In addition, Congress did not overlook secondary liability when it created the private rights of action in the 1934 Act. Section 20 of the 1934 Act imposes liability on "controlling person[s]"—persons who "contro[l] any person liable under any provision of this chapter or of any rule or regulation thereunder." 15 U. S. C. § 78t(a). This suggests that "[w]hen Congress wished to create such [secondary] liability, it had little trouble doing so." *Pinter* v. *Dahl,* 486 U. S., at 650; cf. *Touche Ross & Co.* v. *Redington,* 442 U. S. 560, 572 (1979) ("Obviously, then, when Congress wished to provide a private damages remedy, it knew how to do so and did so expressly"); see also Fischel, 69 Calif. L. Rev., at 96–98. Aiding and abetting is "a method by which courts create secondary liability" in persons other than the violator of the statute. *Pinter* v. *Dahl, supra,* at 648, n. 24. The fact that Congress chose to impose some forms of secondary liability, but not others, indicates a deliberate congressional choice with which the courts should not interfere.

We note that the 1929 Uniform Sale of Securities Act contained a private aiding and abetting cause of action. And at

the time Congress passed the 1934 Act, the blue sky laws of 11 States and the Territory of Hawaii provided a private right of action against those who aided a fraudulent or illegal sale of securities. See Abrams, The Scope of Liability Under Section 12 of the Securities Act of 1933: "Participation" and the Pertinent Legislative Materials, 15 Ford. Urb. L. J. 877, 945, and n. 423 (1987) (listing provisions). Congress enacted the 1933 and 1934 Acts against this backdrop, but did not provide for aiding and abetting liability in any of the private causes of action it authorized.

In sum, it is not plausible to interpret the statutory silence as tantamount to an implicit congressional intent to impose § 10(b) aiding and abetting liability.

## B

When Congress reenacts statutory language that has been given a consistent judicial construction, we often adhere to that construction in interpreting the reenacted statutory language. See, e. g., Keene Corp. v. United States, 508 U. S. 200, 212–213 (1993); Pierce v. Underwood, 487 U. S. 552, 567 (1988); Lorillard v. Pons, 434 U. S. 575, 580–581 (1978). Congress has not reenacted the language of § 10(b) since 1934, however, so we need not determine whether the other conditions for applying the reenactment doctrine are present. Cf. Fogerty v. Fantasy, Inc., 510 U. S. 517, 527–532 (1994).

Nonetheless, the parties advance competing arguments based on other post-1934 legislative developments to support their differing interpretations of § 10(b). Respondents note that 1983 and 1988 Committee Reports, which make oblique references to aiding and abetting liability, show that those Congresses interpreted § 10(b) to cover aiding and abetting. H. R. Rep. No. 100–910, pp. 27–28 (1988); H. R. Rep. No. 355, p. 10 (1983). But "[w]e have observed on more than one occasion that the interpretation given by one Congress (or a committee or Member thereof) to an earlier statute is of little assistance in discerning the meaning of that statute."

*Public Employees Retirement System of Ohio* v. *Betts,* 492 U. S. 158, 168 (1989); see *Weinberger* v. *Rossi,* 456 U. S. 25, 35 (1982); *Consumer Product Safety Comm'n* v. *GTE Sylvania, Inc.,* 447 U. S. 102, 118, and n. 13 (1980).

Respondents observe that Congress has amended the securities laws on various occasions since 1966, when courts first began to interpret § 10(b) to cover aiding and abetting, but has done so without providing that aiding and abetting liability is not available under § 10(b). From that, respondents infer that these Congresses, by silence, have acquiesced in the judicial interpretation of § 10(b). We disagree. This Court has reserved the issue of 10b–5 aiding and abetting liability on two previous occasions. *Herman & MacLean* v. *Huddleston,* 459 U. S., at 379, n. 5; *Ernst & Ernst,* 425 U. S., at 191–192, n. 7. Furthermore, our observations on the acquiescence doctrine indicate its limitations as an expression of congressional intent. "It does not follow . . . that Congress' failure to overturn a statutory precedent is reason for this Court to adhere to it. It is 'impossible to assert with any degree of assurance that congressional failure to act represents' affirmative congressional approval of the [courts'] statutory interpretation. . . . Congress may legislate, moreover, only through the passage of a bill which is approved by both Houses and signed by the President. See U. S. Const., Art. I, § 7, cl. 2. Congressional inaction cannot amend a duly enacted statute." *Patterson* v. *McLean Credit Union,* 491 U. S. 164, 175, n. 1 (1989) (quoting *Johnson* v. *Transportation Agency, Santa Clara Cty.,* 480 U. S. 616, 672 (1987) (SCALIA, J., dissenting)); see *Helvering* v. *Hallock,* 309 U. S. 106, 121 (1940) (Frankfurter, J.) ("[W]e walk on quicksand when we try to find in the absence of corrective legislation a controlling legal principle").

Central Bank, for its part, points out that in 1957, 1959, and 1960, bills were introduced that would have amended the securities laws to make it "unlawful . . . to aid, abet, counsel, command, induce, or procure the violation of any provision"

of the 1934 Act. S. 1179, 86th Cong., 1st Sess. §22 (1959); see also S. 3770, 86th Cong., 2d Sess. §20 (1960); S. 2545, 85th Cong., 1st Sess. §20 (1957). These bills prompted "industry fears that private litigants, not only the SEC, may find in this section a vehicle by which to sue aiders and abettors," and the bills were not passed. SEC Legislation: Hearings before a Subcommittee of the Senate Committee on Banking and Currency on S. 1178, S. 1179, S. 1180, S. 1181, and S. 1182, 86th Cong., 1st Sess., 288, 370 (1959). According to Central Bank, these proposals reveal that those Congresses interpreted §10(b) not to cover aiding and abetting. We have stated, however, that failed legislative proposals are "a particularly dangerous ground on which to rest an interpretation of a prior statute." *Pension Benefit Guaranty Corporation* v. *LTV Corp.*, 496 U. S. 633, 650 (1990). "Congressional inaction lacks persuasive significance because several equally tenable inferences may be drawn from such inaction, including the inference that the existing legislation already incorporated the offered change." *Ibid.* (internal quotation marks omitted); see *United States* v. *Wise*, 370 U. S. 405, 411 (1962).

It is true that our cases have not been consistent in rejecting arguments such as these. Compare *Flood* v. *Kuhn*, 407 U. S. 258, 281–282 (1972), with *Pension Benefit Guaranty Corporation, supra*, at 650; compare *Merrill Lynch, Pierce, Fenner & Smith, Inc.* v. *Curran*, 456 U. S. 353, 381–382 (1982), with *Aaron* v. *SEC*, 446 U. S., at 694, n. 11. As a general matter, however, we have stated that these arguments deserve little weight in the interpretive process. Even were that not the case, the competing arguments here would not point to a definitive answer. We therefore reject them. As we stated last Term, Congress has acknowledged the 10b–5 action without any further attempt to define it. *Musick, Peeler*, 508 U. S., at 293–294. We find our role limited when the issue is the scope of conduct prohibited by the

statute. *Id.*, at 291–292. That issue is our concern here, and we adhere to the statutory text in resolving it.

## C

The SEC points to various policy arguments in support of the 10b–5 aiding and abetting cause of action. It argues, for example, that the aiding and abetting cause of action deters secondary actors from contributing to fraudulent activities and ensures that defrauded plaintiffs are made whole. Brief for SEC 16–17.

Policy considerations cannot override our interpretation of the text and structure of the Act, except to the extent that they may help to show that adherence to the text and structure would lead to a result "so bizarre" that Congress could not have intended it. *Demarest* v. *Manspeaker*, 498 U. S. 184, 191 (1991); cf. *Pinter* v. *Dahl*, 486 U. S., at 654 ("[W]e need not entertain Pinter's policy arguments"); *Santa Fe Industries*, 430 U. S., at 477 (language sufficiently clear to be dispositive). That is not the case here.

Extending the 10b–5 cause of action to aiders and abettors no doubt makes the civil remedy more far reaching, but it does not follow that the objectives of the statute are better served. Secondary liability for aiders and abettors exacts costs that may disserve the goals of fair dealing and efficiency in the securities markets.

As an initial matter, the rules for determining aiding and abetting liability are unclear, in "an area that demands certainty and predictability." *Pinter* v. *Dahl*, 486 U. S., at 652. That leads to the undesirable result of decisions "made on an ad hoc basis, offering little predictive value" to those who provide services to participants in the securities business. *Ibid.* "[S]uch a shifting and highly fact-oriented disposition of the issue of who may [be liable for] a damages claim for violation of Rule 10b–5" is not a "satisfactory basis for a rule of liability imposed on the conduct of business transactions." *Blue Chip Stamps*, 421 U. S., at 755; see also *Virginia Bank-*

*shares,* 501 U. S., at 1106 ("The issues would be hazy, their litigation protracted, and their resolution unreliable. Given a choice, we would reject any theory . . . that raised such prospects"). Because of the uncertainty of the governing rules, entities subject to secondary liability as aiders and abettors may find it prudent and necessary, as a business judgment, to abandon substantial defenses and to pay settlements in order to avoid the expense and risk of going to trial.

In addition, "litigation under Rule 10b–5 presents a danger of vexatiousness different in degree and in kind from that which accompanies litigation in general." *Blue Chip Stamps, supra,* at 739; see *Virginia Bankshares, supra,* at 1105; S. Rep. No. 792, 73d Cong., 2d Sess., p. 21 (1934) (attorney's fees provision is protection against strike suits). Litigation under 10b–5 thus requires secondary actors to expend large sums even for pretrial defense and the negotiation of settlements. See 138 Cong. Rec. S12605 (Aug. 12, 1992) (remarks of Sen. Sanford) (asserting that in 83% of 10b–5 cases major accounting firms pay $8 in legal fees for every $1 paid in claims).

This uncertainty and excessive litigation can have ripple effects. For example, newer and smaller companies may find it difficult to obtain advice from professionals. A professional may fear that a newer or smaller company may not survive and that business failure would generate securities litigation against the professional, among others. In addition, the increased costs incurred by professionals because of the litigation and settlement costs under 10b–5 may be passed on to their client companies, and in turn incurred by the company's investors, the intended beneficiaries of the statute. See Winter, Paying Lawyers, Empowering Prosecutors, and Protecting Managers: Raising the Cost of Capital in America, 42 Duke L. J. 945, 948–966 (1993).

We hasten to add that competing policy arguments in favor of aiding and abetting liability can also be advanced. The point here, however, is that it is far from clear that Congress

in 1934 would have decided that the statutory purposes would be furthered by the imposition of private aider and abettor liability.

### D

At oral argument, the SEC suggested that 18 U. S. C. § 2 is "significant" and "very important" in this case. Tr. of Oral Arg. 41, 43. At the outset, we note that this contention is inconsistent with the SEC's argument that recklessness is a sufficient scienter for aiding and abetting liability. Criminal aiding and abetting liability under § 2 requires proof that the defendant "in some sort associate[d] himself with the venture, that he participate[d] in it as in something that he wishe[d] to bring about, that he [sought] by his action to make it succeed." *Nye & Nissen*, 336 U. S., at 619 (internal quotation marks omitted). But recklessness, not intentional wrongdoing, is the theory underlying the aiding and abetting allegations in the case before us.

Furthermore, while it is true that an aider and abettor of a criminal violation of any provision of the 1934 Act, including § 10(b), violates 18 U. S. C. § 2, it does not follow that a private civil aiding and abetting cause of action must also exist. We have been quite reluctant to infer a private right of action from a criminal prohibition alone; in *Cort* v. *Ash*, 422 U. S. 66, 80 (1975), for example, we refused to infer a private right of action from "a bare criminal statute." And we have not suggested that a private right of action exists for all injuries caused by violations of criminal prohibitions. See *Touche Ross*, 442 U. S., at 568 ("[Q]uestion of the existence of a statutory cause of action is, of course, one of statutory construction"). If we were to rely on this reasoning now, we would be obliged to hold that a private right of action exists for every provision of the 1934 Act, for it is a criminal violation to violate any of its provisions. 15 U. S. C. § 78ff. And thus, given 18 U. S. C. § 2, we would also have to hold that a civil aiding and abetting cause of action is available for every provision of the Act. There would be no logical

stopping point to this line of reasoning: Every criminal statute passed for the benefit of some particular class of persons would carry with it a concomitant civil damages cause of action.

This approach, with its far-reaching consequences, would work a significant shift in settled interpretive principles regarding implied causes of action. See, *e. g., Transamerica Mortgage Advisors, Inc.* v. *Lewis,* 444 U. S. 11 (1979). We are unwilling to reverse course in this case. We decline to rely only on 18 U. S. C. § 2 as the basis for recognizing a private aiding and abetting right of action under § 10(b).

## V

Because the text of § 10(b) does not prohibit aiding and abetting, we hold that a private plaintiff may not maintain an aiding and abetting suit under § 10(b). The absence of § 10(b) aiding and abetting liability does not mean that secondary actors in the securities markets are always free from liability under the securities Acts. Any person or entity, including a lawyer, accountant, or bank, who employs a manipulative device or makes a material misstatement (or omission) on which a purchaser or seller of securities relies may be liable as a primary violator under 10b–5, assuming *all* of the requirements for primary liability under Rule 10b–5 are met. See Fischel, 69 Calif. L. Rev., at 107–108. In any complex securities fraud, moreover, there are likely to be multiple violators; in this case, for example, respondents named four defendants as primary violators. App. 24–25.

Respondents concede that Central Bank did not commit a manipulative or deceptive act within the meaning of § 10(b). Tr. of Oral Arg. 31. Instead, in the words of the complaint, Central Bank was "secondarily liable under § 10(b) for its conduct in aiding and abetting the fraud." App. 26. Because of our conclusion that there is no private aiding and abetting liability under § 10(b), Central Bank may not be held liable as an aider and abettor. The District Court's grant

of summary judgment to Central Bank was proper, and the judgment of the Court of Appeals is

*Reversed.*

JUSTICE STEVENS, with whom JUSTICE BLACKMUN, JUSTICE SOUTER, and JUSTICE GINSBURG join, dissenting.

The main themes of the Court's opinion are that the text of § 10(b) of the Securities Exchange Act of 1934 (Exchange Act), 15 U. S. C. § 78j(b), does not expressly mention aiding and abetting liability, and that Congress knows how to legislate. Both propositions are unexceptionable, but neither is reason to eliminate the private right of action against aiders and abettors of violations of § 10(b) and the Securities and Exchange Commission's (SEC's) Rule 10b-5. Because the majority gives short shrift to a long history of aider and abettor liability under § 10(b) and Rule 10b-5, and because its rationale imperils other well-established forms of secondary liability not expressly addressed in the securities laws, I respectfully dissent.

In *hundreds* of judicial and administrative proceedings in every Circuit in the federal system, the courts and the SEC have concluded that aiders and abettors are subject to liability under § 10(b) and Rule 10b-5. See 5B A. Jacobs, Litigation and Practice Under Rule 10b-5 § 40.02 (rev. ed. 1993) (citing cases). While we have reserved decision on the legitimacy of the theory in two cases that did not present it, all 11 Courts of Appeals to have considered the question have recognized a private cause of action against aiders and abettors under § 10(b) and Rule 10b-5.[1] The early aiding

---

[1] See, *e. g., Cleary* v. *Perfectune, Inc.,* 700 F. 2d 774, 777 (CA1 1983); *IIT* v. *Cornfeld,* 619 F. 2d 909, 922 (CA2 1980); *Monsen* v. *Consolidated Dressed Beef Co.,* 579 F. 2d 793, 799–800 (CA3 1978); *Schatz* v. *Rosenberg,* 943 F. 2d 485, 496–497 (CA4 1991); *Fine* v. *American Solar King Corp.,* 919 F. 2d 290, 300 (CA5 1990); *Moore* v. *Fenex, Inc.,* 809 F. 2d 297, 303 (CA6), cert. denied *sub nom. Moore* v. *Frost,* 483 U. S. 1006 (1987); *Schlifke* v. *Seafirst Corp.,* 866 F. 2d 935, 947 (CA7 1989); *K & S Partnership* v. *Continental Bank, N. A.,* 952 F. 2d 971, 977 (CA8 1991); *Levine* v.

and abetting decisions relied upon principles borrowed from tort law; in those cases, judges closer to the times and climate of the 73d Congress than we concluded that holding aiders and abettors liable was consonant with the Exchange Act's purpose to strengthen the antifraud remedies of the common law.[2] One described the aiding and abetting theory, grounded in "general principles of tort law," as a "logical and natural complement" to the private § 10(b) action that furthered the Exchange Act's purpose of "creation and maintenance of a post-issuance securities market that is free from fraudulent practices." *Brennan* v. *Midwestern United Life Ins. Co.*, 259 F. Supp. 673, 680 (ND Ind. 1966) (borrowing

---

*Diamanthuset, Inc.*, 950 F. 2d 1478, 1483 (CA9 1991); *Farlow* v. *Peat, Marwick, Mitchell & Co.*, 956 F. 2d 982, 986 (CA10 1992); *Schneberger* v. *Wheeler*, 859 F. 2d 1477, 1480 (CA11 1988). The only court not to have squarely recognized aiding and abetting in private § 10(b) actions has done so in an action brought by the SEC, see *Dirks* v. *SEC*, 681 F. 2d 824, 844 (CADC), rev'd on other grounds, 463 U. S. 646 (1983), and has suggested that such a claim was available in private actions, see *Zoelsch* v. *Arthur Andersen & Co.*, 824 F. 2d 27, 35–36 (CADC 1987). The Seventh Circuit's test differs markedly from the other Circuits' in that it requires that the aider and abettor "commit one of the 'manipulative or deceptive' acts prohibited under section 10(b) and rule 10b–5." *Robin* v. *Arthur Young & Co.*, 915 F. 2d 1120, 1123 (CA7 1990).

[2] When § 10(b) was enacted, aiding and abetting liability was widely, albeit not universally, recognized in the law of torts and in state legislation prohibiting misrepresentation in the marketing of securities. See, *e. g.*, 1 T. Cooley, Law of Torts 244 (3d ed. 1906) ("All who actively participate in any manner in the commission of a tort, or who command, direct, advise, encourage, aid or abet its commission, are jointly and severally liable therefor"). Section 16(1) of the Uniform Sale of Securities Act, 9 U. L. A. 385 (1932), conferred a right to sue aiders and abettors of securities fraud, as did the blue sky laws of 11 States. See Abrams, The Scope of Liability Under Section 12 of the Securities Act of 1933: "Participation" and the Pertinent Legislative Materials, 15 Ford. Urb. L. J. 877, 945 (1987). The courts' reliance on common-law tort principles in defining the scope of liability under § 10(b) was by no means an anomaly. See, *e. g.*, *American Soc. of Mechanical Engineers, Inc.* v. *Hydrolevel Corp.*, 456 U. S. 556, 565–574 (1982).

formulation from the Restatement of Torts §876(b) (1939)), later opinion, 286 F. Supp. 702 (1968), aff'd, 417 F. 2d 147 (CA7 1969), cert. denied, 397 U. S. 989 (1970). See also *Pettit* v. *American Stock Exchange*, 217 F. Supp. 21, 28 (SDNY 1963).

The Courts of Appeals have usually applied a familiar three-part test for aider and abettor liability, patterned on the Restatement of Torts formulation, that requires (i) the existence of a primary violation of §10(b) or Rule 10b–5, (ii) the defendant's knowledge of (or recklessness as to) that primary violation, and (iii) "substantial assistance" of the violation by the defendant. See, *e. g., Cleary* v. *Perfectune, Inc.*, 700 F. 2d 774, 776–777 (CA1 1983); *IIT, An Int'l Investment Trust* v. *Cornfeld*, 619 F. 2d 909, 922 (CA2 1980). If indeed there has been "continuing confusion" concerning the private right of action against aiders and abettors, that confusion has not concerned its basic structure, still less its "existence." See *ante*, at 170. Indeed, in this case, petitioner *assumed* the existence of a right of action against aiders and abettors, and sought review only of the subsidiary questions whether an indenture trustee could be found liable as an aider and abettor absent a breach of an indenture agreement or other duty under state law, and whether it could be liable as an aider and abettor based only on a showing of recklessness. These questions, it is true, have engendered genuine disagreement in the Courts of Appeals.[3] But instead of simply addressing the questions presented by the parties, on which the law really was unsettled, the Court *sua sponte* directed

---

[3] Compare, for example, the discussion in the opinion below of scienter in cases in which defendant has no disclosure duty, 969 F. 2d 891, 902–903 (CA10 1993), with that in *Schatz* v. *Rosenberg*, 943 F. 2d 485, 496 (CA4 1991), and *Ross* v. *Bolton*, 904 F. 2d 819, 824 (CA2 1990). See also Kuehnle, Secondary Liability Under The Federal Securities Laws—Aiding and Abetting, Conspiracy, Controlling Person, and Agency: Common-Law Principles and The Statutory Scheme, 14 J. Corp. L. 313, 323–324, and n. 53 (1988).

the parties to address a question on which even the petitioner justifiably thought the law was settled, and reaches out to overturn a most considerable body of precedent.[4]

Many of the observations in the majority's opinion would be persuasive if we were considering whether to recognize a private right of action based upon a securities statute enacted recently. Our approach to implied causes of action, as to other matters of statutory construction, has changed markedly since the Exchange Act's passage in 1934. At that time, and indeed until quite recently, courts regularly assumed, in accord with the traditional common-law presumption, that a statute enacted for the benefit of a particular class conferred on members of that class the right to sue violators of that statute.[5] Moreover, shortly before the Exchange Act was passed, this Court instructed that such "remedial" legislation should receive "a broader and more liberal interpretation than that to be drawn from mere dictionary definitions of the words employed by Congress." *Piedmont & Northern R. Co.* v. *ICC*, 286 U. S. 299, 311 (1932). There is a risk of anachronistic error in applying our current approach to implied causes of action, *ante*, at 176–177, to a statute enacted when courts commonly read stat-

---

[4] "As I have said before, 'the adversary process functions most effectively when we rely on the initiative of lawyers, rather than the activism of judges, to fashion the questions for review.' *New Jersey* v. *T. L. O.*, 468 U. S. 1214, 1216 (1984) (dissenting from order directing reargument)." *Patterson* v. *McLean Credit Union*, 485 U. S. 617, 623 (1988) (STEVENS, J., dissenting from order directing reargument).

[5] See *Merrill Lynch, Pierce, Fenner & Smith, Inc.* v. *Curran*, 456 U. S. 353, 374–378 (1982); *Middlesex County Sewerage Authority* v. *National Sea Clammers Assn.*, 453 U. S. 1, 22–25 (1981) (STEVENS, J., concurring in judgment in part and dissenting in part); *California* v. *Sierra Club*, 451 U. S. 287, 298–301 (1981) (STEVENS, J., concurring). A discussion of the common-law presumption is found in Justice Pitney's opinion for the Court in *Texas & Pacific R. Co.* v. *Rigsby*, 241 U. S. 33, 39–40 (1916). See also, *e. g.*, *Texas & New Orleans R. Co.* v. *Railway Clerks*, 281 U. S. 548, 568–570 (1930).

utes of this kind broadly to accord with their remedial purposes and regularly approved rights to sue despite statutory silence.

Even had § 10(b) not been enacted against a backdrop of liberal construction of remedial statutes and judicial favor toward implied rights of action, I would still disagree with the majority for the simple reason that a "settled construction of an important federal statute should not be disturbed unless and until Congress so decides." *Reves* v. *Ernst & Young*, 494 U. S. 56, 74 (1990) (STEVENS, J., concurring). See *Blue Chip Stamps* v. *Manor Drug Stores*, 421 U. S. 723, 733 (1975) (the "longstanding acceptance by the courts" and "Congress' failure to reject" rule announced in landmark Court of Appeals decision favored retention of the rule).[6]   A policy of respect for consistent judicial and administrative interpretations leaves it to elected representatives to assess settled law and to evaluate the merits and demerits of changing it.[7]   Even when there is no affirmative evidence of rati-

---

[6] None of the cases the majority relies upon to support its strict construction of § 10(b), *ante*, at 173–175, even arguably involved a settled course of lower court decisions.  See *Mertens* v. *Hewitt Associates*, 508 U. S. 248 (1993); *Pinter* v. *Dahl*, 486 U. S. 622, 635, n. 12 (1988); *Chiarella* v. *United States*, 445 U. S. 222, 229, n. 11 (1980); *Sante Fe Industries, Inc.* v. *Green*, 430 U. S. 462, 475–476, n. 15 (1977); *Ernst & Ernst* v. *Hochfelder*, 425 U. S. 185, 191–192, n. 7 (1976).

[7] Of course, when a decision of this Court upsets settled law, Congress may step in to reinstate the old law, cf. Securities Exchange Act § 27A, as added by Pub. L. 102–242, § 476, 105 Stat. 2236, 2387, codified at 15 U. S. C. § 78aa–1 (1988 ed., Supp. IV) (providing that relevant state limitations period should govern actions pending when *Lampf, Pleva, Lipkind, Prupis & Petigrow* v. *Gilbertson*, 501 U. S. 350 (1991), came down).   However, we should not lightly heap new tasks on the Legislature's already full plate.   Moreover, congressional efforts to address the problems posed by judicial decisions that disrupt settled law frequently create special difficulties of their own.   See, *e. g., Plaut* v. *Spendthrift Farm, Inc.*, 1 F. 3d 1487 (CA6 1993) (holding § 27A unconstitutional), cert. pending, No. 93–1121; *Pacific Mut. Life Ins. Co.* v. *First RepublicBank Corp.*, 997 F. 2d 39 (CA5 1993) (upholding it), cert. granted, 510 U. S. 1039 (1994).   See also *Rivers* v. *Roadway Express, Inc.*, *post*, at 304–313.

fication, the Legislature's failure to reject a consistent judicial or administrative construction counsels hesitation from a court asked to invalidate it. Cf. *Burnet* v. *Coronado Oil & Gas Co.*, 285 U. S. 393, 406 (1932) (Brandeis, J., dissenting). Here, however, the available evidence suggests congressional *approval* of aider and abettor liability in private § 10(b) actions. In its comprehensive revision of the Exchange Act in 1975, Congress left untouched the sizable body of case law approving aiding and abetting liability in private actions under § 10(b) and Rule 10b–5.[8] The case for leaving aiding

---

[8] By 1975, the renowned decision in *Brennan* v. *Midwestern United Life Ins. Co.*, 259 F. Supp. 673, 680 (ND Ind. 1966), had been on the books almost a decade and several Courts of Appeals had recognized aider and abettor liability in private actions brought under § 10(b) and Rule 10b–5. See *Kerbs* v. *Fall River Industries, Inc.*, 502 F. 2d 731, 739–740 (CA10 1974); *Landy* v. *FDIC*, 486 F. 2d 139, 162–163 (CA3 1973), cert. denied, 416 U. S. 960 (1974); *Strong* v. *France*, 474 F. 2d 747, 752 (CA9 1973); *Buttrey* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 410 F. 2d 135, 144 (CA7), cert. denied, 396 U. S. 838 (1969). See also *Lanza* v. *Drexel & Co.*, 479 F. 2d 1277, 1301, 1303–1304 (CA2 1973) (en banc); Ruder, Multiple Defendants in Securities Law Fraud Cases: Aiding and Abetting, Conspiracy, *In Pari Delicto*, Indemnification, and Contribution, 120 U. Pa. L. Rev. 597, 620–638 (1972). We have noted the significance of the 1975 amendments in another case involving a "consistent line of judicial decisions" on the implied right of action under § 10(b) and Rule 10b–5. See *Herman & MacLean* v. *Huddleston*, 459 U. S. 375, 384–386 (1983). Those amendments emerged from "'the most searching reexamination of the competitive, statutory, and economic issues facing the securities markets, the securities industry, and, of course, public investors, since the 1930's.'" *Id.*, at 385, n. 20 (quoting H. R. Conf. Rep. No. 94–229, p. 91 (1975)).

Congress' more recent visits to the securities laws also suggest approval of the aiding and abetting theory in private § 10(b) actions. The House Report accompanying an aiding and abetting provision of the 1983 Insider Trading Sanctions Act, see 15 U. S. C. § 78u(d)(2)(A) (1982 ed., Supp. V), contains an approving reference to "judicial application of the concept of aiding and abetting liability to achieve the remedial purposes of the securities laws," H. R. Rep. No. 98–355, p. 10 (1983), and notes with favor *Rolf* v. *Blyth, Eastman Dillon & Co.*, 570 F. 2d 38 (CA2), cert. denied, 439 U. S. 1039 (1978), which affirmed a judgment against an aider and abettor in a private action under § 10(b) and Rule 10b–5. Moreover, § 5 of the

and abetting liability intact draws further strength from the fact that the SEC itself has consistently understood § 10(b) to impose aider and abettor liability since shortly after the rule's promulgation. See *Ernst & Young,* 494 U. S., at 75 (STEVENS, J., concurring). In short, one need not agree as an original matter with the many decisions recognizing the private right against aiders and abettors to concede that the right fits comfortably within the statutory scheme, and that it has become a part of the established system of private enforcement. We should leave it to Congress to alter that scheme.

The Court would be on firmer footing if it had been shown that aider and abettor liability "detracts from the effectiveness of the 10b–5 implied action or interferes with the effective operation of the securities laws." See *Musick, Peeler & Garrett* v. *Employers Ins. of Wausau,* 508 U. S. 286, 298 (1993). However, the line of decisions recognizing aider and abettor liability suffers from no such infirmities. The language of both § 10(b) and Rule 10b–5 encompasses "any person" who violates the Commission's antifraud rules, whether "directly or indirectly"; we have read this "broad" language "not technically and restrictively, but flexibly to effectuate its remedial purposes." *Affiliated Ute Citizens of Utah* v. *United States,* 406 U. S. 128, 151 (1972). In light of the encompassing language of § 10(b), and its acknowledged purpose to strengthen the antifraud remedies of the common law, it was certainly no wild extrapolation for courts to conclude that aiders and abettors should be subject to the

---

Insider Trading and Securities Fraud Enforcement Act of 1988, Pub. L. 100–704, 102 Stat. 4681, contains an express "acknowledgment," *Musick, Peeler & Garrett* v. *Employers Ins. of Wausau,* 508 U. S. 286, 294 (1993), of causes of action "implied from a provision of this title," 15 U. S. C. § 78t–1(d).

private action under § 10(b).[9]   Allowing aider and abettor
claims in private § 10(b) actions can hardly be said to impose
unfair legal duties on those whom Congress has opted to
leave unregulated: Aiders and abettors of § 10(b) and Rule
10b–5 violations have always been subject to *criminal* liabil-
ity under 18 U. S. C. § 2.   See 15 U. S. C. § 78ff (criminal lia-
bility for willful violations of securities statutes and rules
promulgated under them).   Although the Court canvasses
policy arguments against aider and abettor liability, *ante,* at
188–190, it does not suggest that the aiding and abetting the-
ory has had such deleterious consequences that we should
dispense with it on those grounds.[10]   The agency charged
with primary responsibility for enforcing the securities laws
does not perceive such drawbacks, and urges retention of the
private right to sue aiders and abettors.   See Brief for SEC
as *Amicus Curiae* 5–17.

As framed by the Court's order redrafting the questions
presented, this case concerns only the existence and scope of
aiding and abetting liability in suits brought by private par-
ties under § 10(b) and Rule 10b–5.   The majority's rationale,

---

[9] In a similar context we recognized a private right of action against
secondary violators of a statutory duty despite the absence of a provision
explicitly covering them.   See *Merrill Lynch, Pierce, Fenner & Smith,
Inc.* v. *Curran,* 456 U. S., at 394 ("Having concluded that exchanges can
be held accountable for breaching their statutory duties to·enforce their
own rules prohibiting price manipulation, it necessarily follows that those
persons who are participants in a conspiracy to manipulate the market in
violation of those rules are also subject to suit by futures traders who can
prove injury from these violations").

[10] Indeed, the Court anticipates, *ante,* at 191, that many aiders and abet-
tors will be subject to liability as primary violators.   For example, an
accountant, lawyer, or other person making oral or written misrepresenta-
tions (or omissions, if the person owes a duty to the injured purchaser or
seller, cf. *Dirks* v. *SEC,* 463 U. S. 646, 654–655 (1983)) in connection with
the purchase or sale of securities may be liable for a primary violation of
§ 10(b) and Rule 10b–5.   See, *e. g., Akin* v. *Q–L Investments, Inc.,* 959
F. 2d 521, 525–526 (CA5 1992).

however, sweeps far beyond even those important issues. The majority leaves little doubt that the Exchange Act does not even permit the *SEC* to pursue aiders and abettors in civil enforcement actions under § 10(b) and Rule 10b–5. See *ante,* at 177 (finding it dispositive that "the text of the 1934 Act does not itself reach those who aid and abet a § 10(b) violation"). Aiding and abetting liability has a long pedigree in civil proceedings brought by the SEC under § 10(b) and Rule 10b–5, and has become an important part of the SEC's enforcement arsenal.[11] Moreover, the majority's approach to aiding and abetting at the very least casts serious doubt, both for private and SEC actions, on *other* forms of secondary liability that, like the aiding and abetting theory, have long been recognized by the SEC and the courts but are not expressly spelled out in the securities statutes.[12]

---

[11] See, *e. g., SEC* v. *Coffey,* 493 F. 2d 1304, 1316 (CA6 1974); Ruder, 120 U. Pa. L. Rev., at 625–626, nn. 124 and 125. The SEC reports that it asserted aiding and abetting claims in 15 percent of its civil enforcement proceedings in fiscal year 1992, and that elimination of aiding and abetting liability would "sharply diminish the effectiveness of Commission actions." Brief for SEC as *Amicus Curiae* 18, n. 15.

[12] The Court's rationale would sweep away the decisions recognizing that a defendant may be found liable in a private action for *conspiring* to violate § 10(b) and Rule 10b–5. See, *e. g., U. S. Industries, Inc.* v. *Touche Ross & Co.,* 854 F. 2d 1223, 1231 (CA10 1988); *SEC* v. *Coffey,* 493 F. 2d 1304, 1316 (CA6 1974); *Ferguson* v. *Omnimedia, Inc.,* 469 F. 2d 194, 197– 198 (CA1 1972); *Shell* v. *Hensley,* 430 F. 2d 819, 827, n. 13 (CA5 1970); *Dasho* v. *Susquehanna Corp.,* 380 F. 2d 262, 267, n. 2 (CA7), cert. denied *sub nom. Bard* v. *Dasho,* 389 U. S. 977 (1967). See generally Kuehnle, 14 J. Corp. L., at 343–348. Secondary liability is as old as the implied right of action under § 10(b) itself; the very first decision to recognize a private cause of action under the section and rule, *Kardon* v. *National Gypsum Co.,* 69 F. Supp. 512 (ED Pa. 1946), involved an alleged conspiracy. See also *Fry* v. *Schumaker,* 83 F. Supp. 476, 478 (ED Pa. 1947) (Kirkpatrick, C. J.). In addition, many courts, concluding that § 20(a)'s "controlling person" provisions, 15 U. S. C. § 78t, are not the exclusive source of secondary liability under the Exchange Act, have imposed liability in § 10(b) actions based upon *respondeat superior* and other common-law agency principles. See, *e. g., Hollinger* v. *Titan Capital Corp.,* 914 F. 2d 1564, 1576–1577, and

The principle the Court espouses today—that liability may not be imposed on parties who are not within the scope of § 10(b)'s plain language—is inconsistent with long-established SEC and judicial precedent.

As a general principle, I agree, "the creation of new rights ought to be left to legislatures, not courts." *Musick, Peeler,* 508 U. S., at 291. But judicial restraint does not always favor the narrowest possible interpretation of rights derived from federal statutes. While we are now properly reluctant to recognize private rights of action without an instruction from Congress, we should also be reluctant to lop off rights of action that have been recognized for decades, even if the judicial methodology that gave them birth is now out of favor. Caution is particularly appropriate here, because the judicially recognized right in question accords with the long-standing construction of the agency Congress has assigned to enforce the securities laws. Once again the Court has refused to build upon a "'secure foundation . . . laid by others,'" *Patterson* v. *McLean Credit Union,* 491 U. S. 164, 222 (1989) (STEVENS, J., dissenting) (quoting B. Cardozo, The Nature of the Judicial Process 149 (1921)).

I respectfully dissent.

---

n. 27 (CA9 1990) (en banc) (citing and following decisions to this effect from six other Circuits). See generally Kuehnle, 14 J. Corp. L., at 350–376. These decisions likewise appear unlikely to survive the Court's decision. See *ante,* at 184.