Milbry E. BENEDICT and Patricia
H. Benedict, et al., Plaintiffs,

v.

Michael COOPERSTOCK, William Malek,
NBF Cable Systems, Inc., T.I. Invest-
ments, Inc., Dean Turner and Dean Wit-
ter Reynolds, Inc., Defendants.

No. CIV.A 96–40477.

United States District Court,
E.D. Michigan,
Southern Division.

Oct. 7, 1998.

Cheryl A. Fletcher, Dykema, Gossett, Detroit, MI, E. Edward Hood, Laura M. Benitez, Dykema Gossett, Ann Arbor, MI, for Milbry E. Benedict, Patricia H. Benedict, plaintiffs.

Mark J. Eby, Vaughn C. Shaner, Ellis & Eby, Ann Arbor, MI, for Michael Cooperstock.

Arnold S. Schafer, Robert S. McWhorter, Schafer & Weiner, Bloomfield Hills, MI, for William Malek.

John D. Hertzberg, Southfield, MI, for NBF Cable Systems, Incorporated.

Robert H. Fortunate, Foster, Meadows, Detroit, MI, for T.I. Investment, Incorporated.

Terrence G. Berg, U.S. Attorney's Office, Detroit, MI, for U.S.

*MEMORANDUM OPINION AND ORDER GRANTING PLAINTIFFS' MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT, AND DENYING AS MOOT PLAINTIFFS' MOTION FOR DETERMINATION UNDER RULE 54(b)*

GADOLA, District Judge.

Before the court is a motion by plaintiffs for leave to file second amended complaint or, in the alternative, motion for determination under Rule 54(b). For the reasons set forth below, this court will grant plaintiffs' motion for leave to file second amended complaint, and deny plaintiffs' motion for determination under Rule 54(b) as moot.

**Factual Background**

The instant case is one of seven consolidated securities fraud cases currently before this court.[1] This action involves a purported securities fraud scheme ("Ponzi scheme") allegedly perpetrated upon the various plaintiffs by defendants William Malek ("Malek") and Dean Turner ("Turner") separately or together. Defendant Dean Witter Reynolds, Inc. ("DWR") employed Turner, and as such, derivative liability is asserted against it. Plaintiffs allege that defendant Michael Cooperstock ("Cooperstock") solicited investments from plaintiffs as an agent of Malek and Turner. Defendants Lease Equities Inc. ("Lease Equities"), National Business Funding, Inc. ("NBF"), and National NBF Cable Systems Inc. ("NBF Cable") are the alleged vehicles through which the scheme was perpetrated.

The alleged Ponzi scheme occurred from late 1989 through late 1995. Essentially Malek and Turner are alleged to have offered

---

1. The other cases before this court are *Krear v. Malek,* 95–40468, *Eder v. Malek,* 96–40255, *McMaster v. Malek,* 96–40268, *Dixon v. Malek,* 96–40481, *Cracchiolo v. Malek,* 96–40482, and *Pudduck v. Malek,* 96–40483.

the plaintiffs the opportunity to transfer money to defendant Lease Equities, a corporation which was dissolved in 1993, in exchange for promissory notes. Those notes, by their terms, secured assignments by Lease Equities of equipment leases entered into between Lease Equities and third parties. Plaintiffs claim that each alleged secured loan transaction was a sham. Plaintiffs contend that although they were told that the stream of income arising from the business leases was used as collateral for the repayment of the promissory notes, the same leases were assigned multiple times to secure various promissory notes.

It is further alleged that the individual defendants, through the use of the corporate defendants Lease Equities, NBF and NBF Cable, perpetrated the Ponzi scheme by using new investor funds to pay out old promissory notes. In addition, plaintiffs allege that many of the initial promissory notes were for lesser and smaller amounts, while the later promissory notes were for increasingly larger amounts up to $500,000.00. Plaintiffs further allege that the monies received by the defendants from the plaintiffs were not used for any proper business purpose and that some of the defendants have diverted and/or absconded with the monies obtained from the plaintiffs and have additionally used those funds to repay other notes.

On April 29, 1998, this court granted a motion brought by DWR pursuant to Fed. R.Civ.P. 12(b)(6) to dismiss Counts IV and VII in the *Benedict* matter. Those Counts contained claims of control person liability against DWR. The bulk of this court's opinion dealt with Count VII, in which plaintiffs asserted claims against DWR for derivative liability resulting from Turner's alleged violation of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b). Essentially, this court held that plaintiffs could not state a claim for derivative liability against DWR because they had failed to state a claim for a primary violation of § 10(b) against Turner. Specifically, this court found that plaintiffs had failed to allege with sufficient particularity that Turner made any misrepresentations upon which these plaintiffs relied. In the wake of *Central Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), in which

the Supreme Court held explicitly that a private plaintiff may not maintain an action for aiding and abetting under § 10(b), this court found that plaintiffs' conclusory allegations that Turner was substantially involved in a conspiracy to defraud plaintiffs were insufficient to state a claim for a primary violation of § 10(b). Accordingly, this court dismissed Count VII of plaintiffs' first amended complaint, which contained plaintiffs' claim against DWR for control person liability premised on Turner's alleged violation of § 10(b).

On June 16, 1998, plaintiffs filed the instant motion for leave to file a second amended complaint in an attempt to resurrect their claim against DWR for control person liability premised on Turner's alleged violation of § 10(b). In the alternative, plaintiffs request that this court certify the April 29, 1998 order as a final judgment pursuant to Fed. R.Civ.P. 54(b).

### Discussion

### 1. Standard for allowing amendment pursuant to Rule 15(a)

Federal Rule of Civil Procedure 15(a) provides that leave to amend a pleading "shall be freely given where justice so requires." In determining whether "justice so requires," this court enjoys broad discretion. *Hayden v. Ford Motor Company*, 497 F.2d 1292, 1294 (6th Cir.1974). Although Rule 15(a) articulates a fairly liberal standard for amendment, it does not require this court to indulge futile amendments. *DeLoach v. Woodley*, 405 F.2d 496, 496–97 (5th Cir.1968); *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). If a proposed amendment would not withstand a motion to dismiss, leave to amend should be denied. *Keweenaw Bay Indian Community v. State of Michigan*, 11 F.3d 1341, 1348 (6th Cir.1993).

In this case, DWR contends that plaintiffs' proposed amendment would be futile because the allegations pertaining to Turner's alleged violation of § 10(b) are no more specific than those allegations that this court found insufficient to state a claim in the April 29, 1998 order. Accordingly, the issue before this court is whether Count VI of plaintiffs' proposed second amended complaint, which con-

tains plaintiffs' claim against DWR for control person liability premised on Turner's alleged violation of § 10(b), would withstand a motion to dismiss.

## 2. Standard for dismissal pursuant to Rule 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) authorizes the district courts to dismiss any complaint which fails "to state a claim upon which relief can be granted." Rule 12(b)(6) affords the individual defendants in this case an opportunity to test whether, as a matter of law, the plaintiff is entitled to legal relief on his complaint even if everything alleged in the complaint is true. In applying the standards under Rule 12(b)(6), the court must presume all well-pleaded factual allegations in the complaint to be true and draw all reasonable inferences from those allegations in favor of the non-moving party. *Mayer v. Mylod,* 988 F.2d 635, 638 (6th Cir.1993); *Miller v. Currie,* 50 F.3d 373, 377 (6th Cir. 1995). The court need not, however, accord the presumption of truthfulness to any legal conclusion, opinions or deductions, even if they are couched as factual allegations. *Western Mining Council v. Watt,* 643 F.2d 618, 629 (9th Cir.1981); *Mitchell v. Archibald & Kendall, Inc.,* 573 F.2d 429, 432 (7th Cir. 1978); *Sexton v. Barry,* 233 F.2d 220, 223 (6th Cir.1956). Dismissal for failure to state a claim is disfavored:

> [A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.

*Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). *See also Cameron v. Seitz,* 38 F.3d 264, 270 (6th Cir.1994) (stating that a motion to dismiss should be denied unless "it is clear that the plaintiff can prove no set of facts in support of [its] claim that would entitle [it] to relief").

## 3. Analysis

### a. Control person liability

Persons or entities can be held secondarily liable for violations of the securities laws if they are "control persons" with respect to the primary violator. To state a claim for control person liability in the Sixth Circuit, a plaintiff must plead that the alleged control person 1) actually participated in the operations of the primary defendant in general, and 2) possessed the power to control the specific transaction or activity that constitutes the primary violation. *See Sanders Confectionery Prod., Inc. v. Heller Fin., Inc.,* 973 F.2d 474, 486 (6th Cir.1992).

Consistent with its position in its prior motion to dismiss, DWR does not really contest that it is a control person with respect to Turner. Turner was an authorized representative of DWR. Moreover, plaintiffs have clearly pleaded facts sufficient to support a finding of control person liability, namely that DWR knew or should have known for a period of years that its representative, Turner, was involved in a fraudulent scheme and that Turner was operating the scheme from DWR offices. Accordingly, DWR's opposition to the proposed second amended complaint does not rest on the claim that DWR is not a control person with respect to Turner.[2]

Rather, DWR's opposition to plaintiffs' motion for leave to file the second amended complaint rests on DWR's contention that plaintiffs have again failed to state a claim against Turner for a primary violation of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j. DWR points out that control person liability is derivative. *See Rubinstein v. Collins,* 20 F.3d 160, 166 n. 15 (5th Cir.1994). Therefore, if there is no activity that constitutes a primary violation, DWR contends that it cannot be held secondarily liable as a control person.

Accordingly, the issue before this court is whether the allegations in the plaintiffs' second amended complaint are sufficient to state

**2.** This court also notes that in *Hauser v. Farrell,* 14 F.3d 1338, 1341 (9th Cir.1994), the Ninth Circuit held that a broker-dealer is a control person with respect to its registered representatives as a matter of law, and that the broker-

dealer will avoid liability only if it proves it acted in good faith or that the representative was acting beyond the scope of the broker-dealer's control.

a claim against Turner for a primary violation of § 10(b).

To state a claim for a violation of § 10(b), plaintiffs must allege " '1) [t]he use of jurisdictional means 2) to implement a deceptive or manipulative practice (with the requisite scienter) 3) in connection with 4) the purchase or sale of 5) a security 6) causing 7) damages.' " *Sanders,* 973 F.2d at 486 (quoting *Craighead v. E.F. Hutton & Co.,* 899 F.2d 485 (6th Cir.1990)).

DWR's primary contention is that plaintiffs are unable to state a claim under § 10(b) against Turner because they did not rely on any communication from Turner. The plaintiffs did not purchase anything directly from Turner and they never solicited his advice. Rather, plaintiffs dealt exclusively with defendants Malek and Cooperstock. DWR relies heavily on *Central Bank of Denver v. First Interstate Bank of Denver,* 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), in which the Supreme Court held explicitly that a private plaintiff may not maintain an action for aiding and abetting under § 10(b). The essence of the Court's holding is that a defendant must make a material misrepresentation or omission before primary liability under § 10(b) will attach. *See id.* at 177, 114 S.Ct. 1439 (holding that § 10(b) "prohibits only the making of a material misstatement (or omission) or the commission of a manipulative act"); *see also In re Silicon Graphics, Inc. Securities Litig.,* 970 F.Supp. 746, 762 (N.D.Cal.1997)(holding that "[a] defendant is liable for perpetrating a fraudulent scheme only to the extent that he is also found liable for ... making a false or misleading statement"). As noted by the Tenth Circuit in *Anixter v. Home–Stake Prod. Co.,* 77 F.3d 1215 (10th Cir.1996):

> [t]o the extent [some] cases allow liability to attach without requiring a representation to be made by defendant, and reformulate the 'substantial assistance' element of aiding and abetting liability into primary liability, they do not comport with *Central Bank of Denver.*

*Id.* at 1226, n. 10. Accordingly, allegations of mere participation in a fraudulent scheme are insufficient to state a claim under § 10(b). DWR argues that plaintiffs have failed to state a claim under § 10(b) against Turner in this case because they have not alleged that Turner made a material misrepresentation to them.

However, it is not the case that plaintiffs must allege some *direct* communication with Turner to state a claim under § 10(b) against Turner. Section 10(b) specifically provides that persons may not engage in prohibited conduct "directly or indirectly." To state a claim for a violation of § 10(b), plaintiffs must allege that Turner made a false or misleading statement (or omission) in connection with the sale of a security that he knew or should have known would reach potential investors, and that the plaintiffs relied on it and were damaged. *See Anixter,* 77 F.3d at 1226. However, there is no requirement that plaintiffs allege *direct* communication or contact with Turner. As the Supreme Court held in *Central Bank of Denver:*

> The absence of § 10(b) aiding and abetting liability does not mean that secondary actors in the securities markets are always free from liability under the securities Acts. Any person or entity ... who employs a manipulative device or makes a material misstatement (or omission) on which a purchaser or seller of securities relies may be liable as a primary violator under 10b–5, assuming all of the requirements for primary liability under Rule 10b–5 are met.

*Central Bank of Denver,* 511 U.S. at 191, 114 S.Ct. 1439.

This court does note that while there is no requirement of direct communication, *Central Bank of Denver* does require the plaintiffs to allege that they relied on a misrepresentation or omission *attributable to Turner. See id.* at 180, 114 S.Ct. 1439 (holding that "[a] plaintiff must show reliance on the defendant's misstatement or omission to recover under [§ 10(b) ]")(citing *Basic, Inc. v. Levinson,* 485 U.S. 224, 243, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988)); *see also Anixter,* 77 F.3d at 1225; *Dinsmore v. Squardron, Ellenoff, Plesent, Sheinfeld & Sorkin,* 135 F.3d 837, 842 (2d Cir.1998). Accordingly, to withstand DWR's motion to dismiss, plaintiffs must plead, with sufficient particularity, material misstatements (or omissions) attributable either directly or indirectly to Turner

upon which *these plaintiffs* relied to their detriment.

### b. Specific allegations in the complaint

The specific factual allegations in the proposed second amended complaint that provide the basis for plaintiffs' claim that Turner engaged in a primary violation of § 10(b) fall into two broad categories. The first broad category contains allegations related to documents that Lease Equities provided to the plaintiffs in connection with the transactions at issue in this case. The second broad category contains allegations related to a series of affirmative misrepresentations Turner allegedly made to Cooperstock that Turner knew or should have known would reach potential investors such as the plaintiffs in this case.

### i. Documents sent to plaintiffs from Lease Equities

With respect to this first broad category, plaintiffs allege:

On March 23, 1992, by check payable to Lease Equities, the Benedicts invested $20,000.00 in Lease Equities securities. The Benedicts were provided the following documentation from Cooperstock and Lease Equities indicating that the investment was secured by an assignment of an equipment lease between Lease Equities and Heat Treating Services:

a. A promissory note, by and between Cooperstock and the Benedicts, in the amount of $20,000.00. The Note expressly states that Cooperstock grants a security interest in an assignment of Heat Treating Services equipment lease # 1884.

b. An "Assignment of Equipment Lease," by and between Lease Equities and Cooperstock, describing the terms of the assignment of the Heat Treating Services lease. The Assignment expressly states: "Lessor does hereby warrant and represent that the equipment has been delivered to and accepted by the Lessees under the Leases, that the Leases are in full force and effect, and that Lessor has not otherwise assigned or pledged, nor will it assign or pledge, so long as this Assignment shall remain in effect, the whole or any part of the rights assigned, to anyone other than Assignee, its successors or assigns." In providing this warranty to Cooperstock, Lease Equities knew or intended that it be conveyed to investors.

c. An Equipment Lease Agreement, by and between Lease Equities and Heat Treating Services.

d. A "Certificate of Corporate Resolution" for Lease Equities, representing that Lease Equities was a Michigan corporation in good standing.

(Pl.'s Second Am. Compl. at ¶ 22(a)-(d).) Plaintiffs further allege:

[O]n or about May 11, 1994, Lease Equities sent the Benedicts several documents relating to the $135,000 investment.... The documents were transmitted under cover of a letter signed by William Malek, as President of Lease Equities. The documentation included, among other things:

a. Promissory note # 3215, by and between Lease Equities and the Benedicts, in the amount of $135,000. The Note expressly states that Lease Equities grants a security interest equal to 47% of an assignment of a Polynesian Gardens contract (a Florida condominium project) to the Benedicts. The promissory note required Lease Equities to make monthly repayments of principal and interest pursuant to an amortization schedule attached to the note.

b. An "Assignment of Equipment Lease," by and between Lease Equities and the Benedicts, describing the terms under which the Polynesian Gardens lease was assigned by Lease Equities to the Benedicts. The Assignment expressly states: "Lessor [Lease Equities] does hereby warrant and represent that the equipment has been delivered to and accepted by the Lessees [the Benedicts] under the Leases, that the Leases are in full force and effect, and that Lessor has not otherwise assigned or pledged, nor will it assign or pledge, so long as this Assignment shall remain in effect, the whole or any part of the rights assigned, to anyone other than Assignee, its successors or assigns."

c. An "Assignment of Equipment Lease," by and between NBF and Lease

Equities, describing the terms under which the Polynesian Gardens lease was assigned by NBF to Lease Equities. The Assignment expressly states: "Lessor [NBF] does hereby warrant and represent that the equipment has been delivered to and accepted by the Lessees [Lease Equities] under the Leases, that the Leases are in full force and effect, and that Lessor has not otherwise assigned or pledged, nor will it assign or pledge, so long as this Assignment shall remain in effect, the whole or any part of the rights assigned, to anyone other than Assignee, its successors or assigns."

d. A "Private Cable Television Lease and Service Agreement," by and between NBF and Polynesian Gardens.

e. A "Certificate of Corporate Resolution" for Lease Equities, representing that Lease Equities was a Michigan corporation in good standing, and a "Certificate of Corporate Resolution" for NBF, representing that NBF was a Michigan corporation in good standing.

(Pl.'s Second Am. Compl. at ¶ 28(a)-(e).)
Plaintiffs also allege:

[O]n or about September 6, 1994, Lease Equities sent the Benedicts several documents describing the $10,000 investment.... The documents were transmitted under cover of a letter from Pat Reed, Accounts Payable, of Lease Equities. The documentation included, among other things:

a. Promissory note # 3258, by and between Lease Equities and the Benedicts, in the amount of $10,000. The Note expressly states that Lease Equities grants a security interest equal to 4% of an assignment with recourse in a Lease Agreement between Job Skill Technology, Inc. and Bay City–Bangor Township School District. The promissory note required Lease Equities to make monthly repayments of principal and interest.

b. A copy of a lease between Job Skill Technology, Inc. and Bay City–Bangor Township School District.

c. A UCC–1 form.

d. A "Certificate of Corporate Resolution" for Lease Equities, representing that Lease Equities was a Michigan corporation in good standing.

e. An "Assignment of Equipment Lease," by and between Lease Equities and the Benedicts, describing the assignment of the lease from Lease Equities to the Benedicts. The Assignment expressly states: "Lessor [Lease Equities] does hereby warrant and represent that the equipment has been delivered to and accepted by the Lessees [the Benedicts] under the Leases, that the Leases are in full force and effect, and that Lessor has not otherwise assigned or pledged, nor will it assign or pledge, so long as this Assignment shall remain in effect, the whole or any part of the rights assigned, to anyone other than Assignee, its successors or assigns."

f. An "Assignment of Equipment Lease" by and between Job Skill Technology, Inc. and Lease Equities, describing the assignment of the lease from Job Skill Technology to Lease Equities.

(Pl.'s Second Am. Compl. at ¶ 29(a)-(f).)

The plaintiffs then go on to specifically allege how the affirmative representations contained in these documents were materially false:

The affirmative representations described above were false in many material respects, including the following:

a. The notes expressly state that the investment is secured and collateralized by an assignment of a specific equipment lease ... when, in fact, the leases were nonexistent or already had been assigned to other investors.

b. The assignments expressly state that the leases were in full force and effect when, in fact, the leases were nonexistent.

c. The assignments expressly state that Lease[ ] Equities and/or NBF had not otherwise assigned or pledged any part of the rights assigned when, in fact, the leases already [had] been assigned to multiple investors.

d. The certificates of corporate resolution for Lease Equities represent that Lease Equities was a Michigan corpora-

tion in good standing, even though Lease Equities was dissolved on May 15, 1993 for failure to file annual reports.

(Pl.'s Second Am. Compl. at ¶ 30(a)-(d).) Finally, plaintiffs allege that:

The affirmative representations described above omit the following material facts such that the affirmative representations were false and misleading:

a. That the assignments purportedly given as collateral for repayment of the promissory notes had been assigned to other holders in connection with note obligations which, in the aggregate, exceeded the stream of income payable to Lease Equities.

b. That the language in the promissory notes suggesting that each note holder had a security interest in the underlying lease or cable services contract was false.

c. That Malek and Turner planned to divert most, if not all of the funds received from the Benedicts to pay other obligations rather than to fund the leases which were given as collateral for each of the notes or to fund new leases—to wit, to fund prior notes with earlier investors, to fund the business operations of related entities, and for their personal obligation and to repay monies to financial institutions that had no relationship with Lease Equities' business of leasing and acquiring investors through the use of the promissory notes.

d. That the notes were essentially ... unsecured obligations of Lease Equities and that the chance of repayment after default [was] virtually nonexistent.

e. That Lease Equities was automatically dissolved on May 15, 1993, for failure to file annual reports and that, as a consequence, Lease Equities lacked the corporate power and authority to issue the notes.

f. That the notes, as unregistered securities, were not exempt from registration under the securities laws.

g. That the notes were issued as part of a Ponzi scheme.

h. That Lease Equities did not always take steps to perfect investors' security interests.

(Pl.'s Second Am. Compl. at ¶ 31(a)-(h).[3])

In order to connect these representations to Turner, plaintiffs allege that:

Turner was ... vice president of Lease Equities. Turner had direct involvement in the day-to-day affairs of Lease Equities .... As vice president of Lease Equities, Turner controlled the content of the documents distributed by Lease Equities.

(Pl.'s Second Am. Compl. at ¶ 6.) Accordingly, plaintiffs contend that they have alleged with sufficient particularity, material misstatements and omissions contained in these documents which are attributable to Turner and on which plaintiffs relied to their detriment. Therefore, plaintiffs assert that they have stated a valid claim for a primary violation of § 10(b) against Turner, and in turn for control person liability against DWR.

### ii. Representations by Turner to Cooperstock

The second broad category of factual allegations in support of plaintiffs' claims against Turner for a primary violation of § 10(b) relate to a series of affirmative representations Turner allegedly made to Cooperstock, that Turner knew or should have known would reach potential investors such as the plaintiffs in this case. Specifically, plaintiffs allege that:

Cooperstock was a conduit for Lease Equities and NBF in connection with the sale of Lease Equities notes. On dates and at places not yet known to Plaintiffs and within the peculiar knowledge of the defendants, Malek and Turner, through their alter egos Lease Equities and NBF, made representations regarding Lease Equities notes to Cooperstock, knowing or intending that such representations would be conveyed to investors.

In furtherance of this scheme to defraud investors and to violate the securities laws, Malek and Turner, through their alter egos Lease Equities and NBF made the

**3.** At page 10 of the second amended complaint, plaintiffs have labeled this paragraph as ¶ 42. However, it is clear from the surrounding paragraphs that the paragraph is actually ¶ 31. Accordingly, in the context of this opinion, this court will refer to this paragraph as ¶ 31.

following affirmative representations to Cooperstock, that they knew or should have known would reach potential investors like the Benedicts:

    a. That promissory notes sold to investors would be secured and collateralized by the underlying stream of income on the equipment leases and/or cable services contracts purportedly assigned in favor of each note holder.

    b. That the leases and/or cable services contracts that were being assigned to the note holder represented very profitable long term arrangements which in turn permitted Lease Equities to offer repayment of principal and interest at above-market rates.

    c. That the investments were safe and secured and that the individuals transferring money to Lease Equities in exchange for notes were virtually guaranteed repayment of the indebtedness by virtue of the assignment of Lease Equities' interest in the underlying equipment leases and/or cable services contracts.

(Pl.'s Second Am. Compl. at ¶¶ 19–20.) Again in ¶¶ 30–31, plaintiffs allege the ways in which these representations were materially inaccurate, and the ways in which they omit material facts such that the affirmative representations are false and misleading.[4] Accordingly, plaintiffs assert that they have alleged with sufficient particularity material misstatements or omissions attributable to Turner on which these plaintiffs relied to their detriment. Therefore, with respect to this second category of allegations, plaintiffs again contend that they have stated a valid claim against Turner for a primary violation of § 10(b), and against DWR for control person liability.

### c. Sufficiency of the allegations in the second amended complaint

### i. Documents sent to plaintiffs from Lease Equities

▮▮▮▮ Plaintiff's rely principally on the "group published information" doctrine to

support their contention that they have alleged with sufficient particularity that Turner was an original source of the information contained in the documents sent from Lease Equities to the plaintiffs. Pursuant to that doctrine:

    [a] plaintiff may satisfy Fed.R.Civ.P. 9(b) through reliance upon a presumption that the allegedly false and misleading 'group published information' complained of is the collective action of officers and directors.

*In re GlenFed, Inc. Sec. Litig.,* 60 F.3d 591, 593 (9th Cir.1995)(citing *Blake v. Dierdorff,* 856 F.2d 1365, 1369 (9th Cir.1988); *Wool v. Tandem Computers, Inc.,* 818 F.2d 1433, 1440 (9th Cir.1987)). Here plaintiffs have alleged that at all times relevant to the instant complaint, Turner was the Vice President of Lease Equities and that he had direct involvement in the day-to-day affairs of Lease Equities. Accordingly, plaintiffs contend that they are entitled to a presumption that the representations contained in the documents sent to the plaintiffs from Lease Equities were attributable to Turner due to his status as an officer of the corporation.

In response, DWR makes essentially two arguments. First, DWR claims that plaintiffs have only offered the conclusory allegation that Turner was directly involved in the day-to-day operations of Lease Equities. DWR relies on *In re Gupta Corp. Sec. Litig.,* 900 F.Supp. 1217 (N.D.Cal.1994), for the proposition that mere conclusory allegations of day-to-day control are insufficient to warrant the application of the group pleading doctrine. In that case, the court did hold that the plaintiffs were required to support their allegations with assertions of specific day-to-day involvement in the management of the company. *See id.* at 1241. However, the court's analysis concerned two outside directors and a minority shareholder. With respect to similar allegations made against the actual executives of the corporation, the court specifically noted:

    [The corporate executives] admit that they qualify as individuals with direct involve-

---

4. This court notes that ¶¶ 30 and 31 address the ways in which the notes and assignments delivered by Lease Equities are misleading or false. However, the content of the assertions contained in ¶¶ 30 and 31 clearly also indicate the ways in which the representations contained in ¶¶ 19 and 20 are allegedly misleading or false. (*See, e.g.,* Pl.'s Second Am. Compl. at ¶ 20(a) and ¶ 30(a); Pl.'s Second Am. Compl. at ¶ 20(c) and ¶ 31(d).)

ment in the day-to-day affairs of [the corporation]. Accordingly, they do not dispute their liability for the allegedly false and misleading statements contained in [the corporation's] financial statements, reports to the SEC, and press releases. *Id.* at 1239. Given that plaintiffs have alleged that Turner is an executive of Lease Equities, this court finds DWR's reliance on *In re Gupta* to be misplaced.

DWR's second argument is more persuasive. Again relying on *In re Gupta*, DWR claims that the group pleading doctrine is limited to allegedly false and misleading statements in documents like " 'prospectuses, registration statements, annual reports [and] press releases ....' " *Id.* (quoting *Wool*, 818 F.2d at 1440). DWR argues that the various promissory notes, equipment leases and service agreements that were delivered to the individual plaintiffs in connection with their individual transactions are not the type of documents that courts have intended to include under the umbrella of the group pleading doctrine. While this court notes that nothing in the language of *In re Gupta* specifically limits the group pleading doctrine to prospectuses, registration statements and the like, it would appear from a review of the cases in which courts have applied the group pleading doctrine that the doctrine is so limited. The vast majority of courts that have applied the doctrine have done so in cases where the alleged misstatements at issue were contained in prospectuses, SEC filings, registration statements, and other documents prepared for distribution to the public. *See, e.g., Wool,* 818 F.2d at 1435–36; *Powers v. Eichen,* 977 F.Supp. 1031, 1040 (S.D.Cal. 1997); *In re Silicon Graphics, Inc. Sec. Litig.,* 970 F.Supp. 746, 750–51, 759–60 (N.D.Cal.1997); *Picard Chem. Inc. Profit Sharing Plan v. Perrigo,* 940 F.Supp. 1101, 1127 (W.D.Mich.1996); *In re Gupta,* 900 F.Supp. at 1239.

█ Plaintiffs rely on *Future Tech Int'l, Inc. v. Tae Il Media, Ltd.,* 944 F.Supp. 1538 (S.D.Fla.1996), for the proposition that the group pleading presumption applies to *any* document bearing the corporate name. However, *Future Tech* does not support plaintiffs' claim. In *Future Tech,* an individual corporate representative defendant filed a motion to dismiss certain fraud claims

brought against him asserting that the plaintiffs had failed to plead fraud with sufficient particularity under Rule 9(b). The defendant's principal argument was that the complaint made blanket references to acts or omissions of all defendants without specifying the acts or omissions of each defendant. The *Future Tech* court found the plaintiffs' allegations were sufficient to satisfy Rule 9(b) relying in part on the group pleading doctrine.

In its discussion of the group pleading doctrine the court did note that:

'group pleading is appropriate where the Defendants are insiders or affiliates of the corporate Defendant and the allegedly false information is disseminated through documents or correspondence in the name of the corporation.'

*Id.* at 1572 (quoting *Selgrad v. U.S. Lending Corp.,* Case No. 95–2053–CIV–MARCUS, Ord. Grant. in Part and Den. in Part Def.'s Mot. to Dismiss and Stay (S.D.Fla. March 20, 1996)). This language does not limit the group pleading doctrine to documents such as prospectuses and SEC filings, and it is apparently this language upon which plaintiffs rely for their assertion that the group pleading doctrine applies to *any* document bearing the corporate name.

█ This court rejects plaintiffs' claim. First, this court notes that the cases cited by the *Selgrad* court for the proposition cited above all involved prospectuses, SEC filings or other public documents. *See, e.g., Wool,* 818 F.2d at 1437 (press releases and forms 10–Q); *In re MTC Electronic Tech. Shareholders Litig.,* 898 F.Supp. 974 (S.D.N.Y.1995)(prospectus); *DiVittorio v. Equidyne Extractive Indus.,* 822 F.2d 1242, 1247 (2d Cir.1987)(public offering memorandum); *In re Sahlen & Assoc., Inc. Sec. Litig.,* 773 F.Supp. 342, 362 (S.D.Fla.1991)("public documents and SEC filings"). Moreover, in finding that the group pleading doctrine applied to the generalized allegations of fraudulent conduct in *Future Tech,* the *Future Tech* court relied heavily on an allegation in the plaintiffs' complaint that the individual corporate representative defendant personally authored a letter to the plaintiff that contained alleged misrepresentations. *See Future*

**764**

*Tech,* 944 F.Supp. at 1571–72. There is no such allegation of a direct written communication between Turner and plaintiffs in this case. Under those circumstances, this court finds that *Future Tech* does not support plaintiffs' claim that the group pleading doctrine applies to the documents in the instant case.

Nonetheless, given the underlying purposes of Rule 9(b), this court finds that plaintiffs' allegations related to the documents sent from Lease Equities to plaintiffs are sufficiently particular to withstand a motion to dismiss. As the court noted in *Petri v. Gatlin,* 997 F.Supp. 956 (N.D.Ill.1997), "under Rule 9(b) '[p]erhaps the most basic consideration in making a judgment as to the sufficiency of a pleading is the determination of how much detail is necessary to give adequate notice to an adverse party and enable him to prepare a responsive pleading.'" *Id.* at 975(quoting 5 Charles A. Wright and Arthur R. Miller, Federal Practice and Procedure, § 1288, at 648 (2d ed.1990)); *see also Michaels Bldg. Co. v. Ameritrust Co.,* 848 F.2d 674, 681 (6th Cir.1988)(noting that plaintiffs should not be punished for ignorance of factual detail "as long as defendants have adequate notice of why they are being sued and are capable of preparing a responsive pleading").

In *Petri,* the court was faced with claims related to alleged misrepresentations in corporate brochures. Though the plaintiffs had not alleged specifically which corporate representative had drafted the brochures, the court found that the plaintiffs' allegations passed muster under Rule 9(b) because that case was "not a case in which the failure to provide additional specific details implicates the objectives of the rule." *Petri,* 997 F.Supp. at 975.[5] The court went on to note:

> The plaintiffs' fraud allegations are neither cryptic nor confusing. The plaintiffs have specified the alleged misrepresentations and have attached a copy of the document in which the alleged misrepresentations appear. Aside from the [corporation], only three individuals are named as defendants. The complaint is sufficiently particular to

inform the defendants of the nature of the claims against them, and those defendants are entirely capable of drafting an adequate response.

*Id.*

This court finds *Petri* analogous to the instant case. With respect to the documents distributed to the plaintiffs by Lease Equities, the plaintiffs have clearly alleged the representations contained in those documents with which they take issue (*see* Pl.'s Second Am. Compl. at ¶¶ 22, 28, 29), and they have specifically alleged the ways in which those representations were materially false and/or misleading (*see* Pl.'s Second Am. Compl. at ¶¶ 30, 31). As in *Petri,* plaintiffs have also attached copies of the documents in which the alleged misrepresentations appear. (*See* Pl.'s Second Am. Compl., Ex. 1–3.) Moreover, only two individuals associated with Lease Equities, namely Malek and Turner, are named as defendants in this action. Accordingly, this court finds that the plaintiffs' allegations of fraud against Turner are not so cryptic that they would prevent defendants in this case, specifically Turner and DWR, from drafting an adequate response to the plaintiffs' second amended complaint. Therefore, this court finds that plaintiffs' allegations as to the documents delivered to the plaintiffs from Lease Equities are sufficiently particular to pass muster under Rule 9(b).

#### ii. Representations by Turner to Cooperstock

As noted above, the second broad category of allegations in the plaintiffs' second amended complaint relates to misrepresentations Malek and Turner allegedly made to Cooperstock which Cooperstock eventually communicated to plaintiffs. Defendants again contend that plaintiffs have failed to plead these misrepresentations with the specificity required under Rule 9(b).

As the Tenth Circuit held in *Anixter,* a case upon which DWR itself relies, primary liability under § 10(b) will attach where an actor "knew or should have known that his

---

5. This court does note that the *Petri* court also found that the brochures in that case "fit the 'group-published' mold." *Petri,* 997 F.Supp. at 974. However, the court offered its discussion of the purposes underlying Rule 9(b) as an alternative justification for finding the complaint sufficiently particular under Rule 9(b).

representation would be communicated to investors ...." *Anixter*, 77 F.3d at 1226. The *Picard* court noted that:

> [i]n such circumstances, it was the defendant's original statement which misled investors—the person who communicated the statement served as a mere conduit for defendant's statement. The key to determining primary liability is that plaintiff must allege that defendant was the original and knowing source of the misrepresentation.

*Picard*, 940 F.Supp. at 1120. This court finds that the plaintiffs have alleged with sufficient particularity that Turner was an original and knowing source of the representations communicated to them by Cooperstock.

In *Michaels Building Co. v. Ameritrust Co.*, 848 F.2d 674, 679 (6th Cir.1988), the Sixth Circuit noted that fraud was sufficiently pleaded where the complaint specifies 1) the parties and the participants to the alleged fraud; 2) the representations made; 3) the nature in which the statements are alleged to be misleading or false; 4) the time, place and content of the representations; 5) the fraudulent scheme; 6) the fraudulent intent of the defendants; 7) reliance on the fraud; and 8) the injury resulting from the fraud. Upon a thorough review of plaintiffs' second amended complaint, this court finds that the plaintiffs have complied with the standard set forth in *Michaels*. The complaint specifies the parties and participants to the alleged fraud and the content of the representations made. (*See* Pl.'s Second Am. Compl. at ¶¶ 19–20.) The complaint also specifies the nature in which the statements are alleged to be misleading or false. (*See* Pl.'s Second Am. Compl. at ¶¶ 30–31.[6]) Further, plaintiffs have specifically alleged the fraudulent scheme and the fraudulent intent of the defendants. (*See* Pl.'s Second Am. Compl. at ¶¶ 12–16.) Finally, the plaintiffs have also alleged reliance on the fraud and the injury resulting from the fraud. (*See* Second Am. Comp. at ¶¶ 26, 32.)

The only part of the *Michaels* standard with which the plaintiffs have not complied is the requirement that plaintiffs allege the time and place of the representations. However, this court notes that "Rule 9's strictures are relaxed where the alleged fraud concerns facts 'peculiarly within the opposing party's knowledge.'" *Trustees of Plumbers & Pipefitters Nat'l Pension Fund v. Transworld Mechanical, Inc.*, 886 F.Supp. 1134, 1142 (S.D.N.Y.1995)(quoting *DiVittorio*, 822 F.2d at 1247). Here, plaintiffs have alleged that "[o]n dates and at places not yet known to Plaintiffs and within the peculiar knowledge of defendants, Malek and Turner, through their alter egos Lease Equities and NBF, made representations regarding Lease Equities notes to Cooperstock ...." (Pl.'s Second Am. Comp. at ¶ 19.) Under the circumstances of this case, it is not surprising that plaintiffs do not have access to the exact dates and places of the alleged misrepresentations that they allege ultimately came from Turner. However, this court does not find that the failure to include those dates and places should result in dismissal of plaintiffs' second amended complaint. Given the state of the plaintiffs' knowledge at this stage of the litigation, this court is satisfied that plaintiffs have satisfied their burden under Rule 9(b).

Accordingly, this court finds that plaintiffs' allegations related to the affirmative misrepresentations allegedly made by Turner to Cooperstock which were eventually communicated to plaintiffs are sufficient to state a claim against Turner for a primary violation of § 10(b).

**Conclusion**

For the reasons set forth above, this court finds that plaintiffs' second amended complaint is sufficient to withstand a motion to dismiss by DWR related to the control person count premised on Turner's alleged violation of § 10(b). Accordingly, this court will grant plaintiffs' motion for leave to file its second amended complaint. Because this

---

**6.** Again, this court notes that ¶¶ 30 and 31 address the ways in which the notes and assignments delivered by Lease Equities are misleading or false. However, the content of the assertions contained in ¶¶ 30 and 31 clearly also indicate the ways in which the representations contained in ¶¶ 19 and 20 are allegedly misleading or false. (*See, e.g.*, Pl.'s Second Am. Compl. at ¶ 20(a) and ¶ 30(a); Pl.'s Second Am. Compl. at ¶ 20(c) and ¶ 31(d).)

court will grant plaintiffs' motion for leave to file the amended complaint, this court will deny as moot plaintiffs' request to certify this court's April 29, 1998 order as a final judgment.

**Order**

Therefore, this court having reviewed the submissions of the parties, and being fully advised in the premises,

**IT IS HEREBY ORDERED** that the motion by plaintiffs for leave to file second amended complaint is **GRANTED**, and this court hereby **ACCEPTS** plaintiffs' second amended complaint for filing.

**IT IS FURTHER ORDERED** that plaintiffs' motion to certify this court's April 29, 1998 order as a final judgment is **DENIED without prejudice as moot.**

**SO ORDERED.**