Justice Breyer,
with whom Justice Ginsburg, Justice Sotomayor, and Justice Kagan join,
dissenting.
This case involves a private Securities and Exchange Commission (SEC) Rule 10b-5 action brought by a group of investors against Janus Capital Group, Inc., and Janus Capital Management LLC (Janus Management), a firm that acted as an investment adviser to a family of mutual funds (collectively, the Janus Fund or Fund). The investors claim *149 that Janus Management knowingly made materially false or misleading statements that appeared in prospectuses issued by the Janus Fund. They say that they relied upon those statements, and that they suffered resulting economic harm.
Janus Management and the Janus Fund are closely related. Each of the Fund's officers is a Janus Management employee. Janus Management, acting through those employees (and other of its employees), manages the purchase, sale, redemption, and distribution of the Fund’s investments. Janus Management prepares, modifies, and implements the Janus Fund’s long-term strategies. And Janus Management, acting through those employees, carries out the Fund’s daily activities.
Rule 10b — IS says in relevant, part that it is unlawful for “any person, directly or indirectly . . . [t]o make any untrue statement of a material fact” in connection with the purchase or sale of securities. 17 CFR § 240.10b-5(b) (2010) (emphasis added). See also 15 U. S. C. § 78j(b) (2006 ed., Supp. IV) (§ 10(b) of the Securities Exchange Act of 1934). The specific legal question before us is whether Janus Management can be held responsible under the Rule for having “ma[d]e” certain false statements about the Janus Fund’s activities. The statements in question appear in the Janus Fund’s prospectuses.
The Court holds that only the Janus Fund, not Janus Management, could have “ma[d]e” those statements. The majority points out that the Janus Fund’s board of trustees has “ultimate authority” over the content of the statements in a Fund prospectus. And in the majority’s view, only “the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it,” can “make” a statement within the terms of Rule 10b~5. Ante, at 142.
In my view, however, the majority has incorrectly interpreted the Rule’s word “make.” Neither common English *150 nor this Court’s earlier cases limit the scope of that word to those with “ultimate authority” over a statement's content. To the contrary, both language and case law indicate that, depending upon the circumstances, a management company, a board of trustees, individual company officers, or others, separately or together, might “make” statements contained in a firm’s prospectus — even if a board of directors has ultimate content-related responsibility. And the circumstances here are such that a court could find that Janus Management made the statements in question.
HH
Respondent s complaint sets forth the basic elements of a typical Rule 10b-5 “fraud on the market” claim. It alleges that Janus Management made statements that “created the misleading impression that” it “would implement measures to curb” a trading strategy called “market timing.” Second Amended Complaint ¶6 (hereinafter Complaint), App. to Pet. for Cert. 60a. The complaint adds that Janus Management knew that these “market timing” statements were false; that the statements were material; that the market, in pricing securities (including related securities) relied upon the statements; that as a result, when the truth came out (that Janus Management indeed permitted “market timing” in the Janus Fund), the price of relevant shares fell; and the false statements thereby caused respondent significant economic losses. Complaint ¶¶4-10, id., at 60a-63a. Cf. Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc., 552 U. S. 148, 157 (2008) (identifying the elements of “a typical § 10(b) private action”).
The majority finds the complaint fatally flawed, however, because (1) Rule 10b-5 says that no “person” shall “directly or indirectly . . . make any untrue statement of a material fact,” (2) the statements at issue appeared in the Janus Fund’s prospectuses, and (3) only “the person or entity with ultimate authority over the statement, including its content *151 and whether and how to communicate it,” can “make” a false statement. Ante, at 138-139, 141-143.
But where can the majority find legal support for the rule that it enunciates? The English language does not impose upon the word “make” boundaries of the kind the majority finds determinative. Every day, hosts of corporate officials make statements with content that more senior officials or the board of directors have “ultimate authority” to control. So do cabinet officials make statements about matters that the Constitution places within the ultimate authority of the President. So do thousands, perhaps millions, of other employees make statements that, as to content, form, or timing, are subject to the control of another.
Nothing in the English language prevents one from saying that several different individuals, separately or together, “make” a statement that each has a hand in producing. For example, as a matter of English, one can say that a national political party has made a statement even if the only written communication consists of uniform press releases issued in the name of local party branches; one can say that one foreign nation has made a statement even when the officials of a different nation (subject to its influence) speak about the matter; and one can say that the President has made a statement even if his press officer issues a communication, sometimes in the press officer’s own name. Practical matters related to context, including control, participation, and relevant audience, help determine who “makes” a statement and to whom that statement may properly be “attributed,” see ante, at 147, n. 11 — at least as far as ordinary English is concerned.
Neither can the majority find support in any relevant precedent. The majority says that its rule “follows from Central Bank of Denver, N. A. v. First Interstate Bank of Denver, N. A., 511 U. S. 164 (1994),” in which the Court “held that Rule 10b-5’s private right of action does not include suits against aiders and abettors.” Ante, at 143. But Central *152 Bank concerns a different matter. And it no more requires the majority’s rule than free air travel for small children requires free air travel for adults.
Central Bank is a case about secondary liability, liability attaching, not to an individual making a false statement, but to an individual helping someone else do so. Central Bank involved a bond issuer accused of having made materially false statements, which overstated the values of property that backed the bonds. Central Bank also involved a defendant that was a bank, serving as indenture trustee, which was supposed to check the bond issuer’s valuations. The plaintiffs claimed that the bank delayed its valuation checks and thereby helped the issuer make its false statements credible. The question before the Court concerned the bank’s liability — a secondary liability for “aiding and abetting” the bond issuer, who (on the theory set forth) was primarily liable.
The Court made this clear. The question presented was “whether private civil liability under § 10(b) extends ... to those who do not engage in the manipulative or deceptive practice, but who aid and abet the violation.” 511 U. S., at 167 (emphasis added). The Court wrote that “aiding and abetting liability reaches persons who do not engage in the proscribed activities at all, but who give a degree of aid to those who do.” Id., at 176 (emphasis added). The Court described civil law “aiding and abetting” as “'know-ting] that the other’s conduct constitutes a breach of duty and giv[ing] substantial assistance or encouragement to the other . . . Id., at 181 (quoting Restatement (Second) of Torts § 876(b) (1977); emphasis added). And it reviewed a Court of Appeals decision that had defined the elements of aiding and abetting as “(1) a primary violation of § 10(b); (2) recklessness by the aider and abettor as to the existence of the primary violation; and (3) substantial assistance given to the primary violator by the aider and abettor.” 511 U. S., at 168 (emphasis added). Faced with this question, *153 the Court answered that § 10(b) and Rule 10b-5 do not provide for this kind of “aiding and abetting” liability in private suits.
By way of contrast, the present case is about primary liability — about individuals who allegedly themselves “make” materially false statements, not about those who help others to do so. The question is whether Janus Management is primarily liable for violating the Act, not whether it simply helped others violate the Act. The Central Bank defendant concededly did not make the false statements in question (others did), while here the defendants allegedly did make those statements. And a rule (the majority’s rule) absolving those who allegedly did, make false statements does not “follow from” a rule (Central Bank’s rule) absolving those who concededly did not do so.
The majority adds that to interpret the word “make” as including those “without ultimate control over the content of a statement” would “substantially undermine” Central Bank’s holding. Ante, at 143. Would it? The Court in Central Bank specifically wrote that its holding did
“not mean that secondary actors in the securities markets are always free from liability under the securities Acts. Any person or entity, including a lawyer, accountant, or bank, who employs a manipulative device or makes a material misstatement (or omission) on which a purchaser or seller of securities relies may be liable as a primary violator under 1 Ob-5, assuming all of the requirements for primary liability under Rule 10b-5 are met.” 511 U. S., at 191 (some emphasis added).
Thus, as far as Central Bank is concerned, depending upon the circumstances, board members, senior firm officials, officials tasked to develop a marketing document, large investors, or others (taken together or separately) all might “make” materially false statements subjecting themselves to *154 primary liability. The majority’s rule does not protect, it extends, Central Bank’s holding of no-liability into new territory that Central Bank explicitly placed outside that holding. And by ignoring the language in which Central Bank did so, the majority’s rule itself undermines Central Bank. Where is the legal support for the majority’s “draw[ing] a clean line,” ante, at 143, n. 6, that so seriously conflicts with Central Bank? Indeed, where is the legal support for the majority’s suggestion that plaintiffs must show some kind of “attribution” of a statement to a defendant, ante, at 147, n. 11 — if it means plaintiffs must show, not only that the defendant “ma[d]e” the statement, but something more?
The majority also refers to Stoneridge, but that case offers it no help. In Stoneridge, firms that supplied electronic equipment to a cable television company agreed with the cable television company to enter into a series, of fraudulent sales and purchases, for example, a sale at an unusually high price, thereby providing funds which the suppliers would use to buy advertising from the cable television company. These arrangements enabled the cable television company to fool its accountants (and ultimately the public) into believing that it had more revenue (for example, advertising revenue) than it really had. As part of the agreement, the companies exchanged letters and backdated contracts to conceal the fraud. Investors subsequently sued the cable television company, some of its officers, its auditors, and the equipment suppliers, as well, claiming that all of them had engaged in a scheme to defraud securities purchasers. In respect to most of the defendants, investors identified allegedly materially false statements contained in the cable television company’s financial statements or similar documents. But in respect to the equipment suppliers, investors claimed that the relevant deceptive conduct was in the letters, backdated contracts, and related oral conversations about the scheme. The investors argued that the *155 equipment suppliers, “by participating in the transactions,” violated § 10(b) and Rule 10b-5. Stoneridge, 552 U. S., at 155.
The Court held that the equipment suppliers could not be found liable for securities fraud in a private suit under § 10(b). But in doing so, it did not deny that the equipment suppliers had made the false statements contained in the letters, contracts, and conversations. See id., at 158-159. Rather, the Court said the issue in the case was whether “any deceptive statement or act respondents made was not actionable because it did not have the requisite proximate relation to the investors’ harm.” Ibid, (emphasis added). And it held that these deceptive statements or actions could not provide a basis for liability because the investors could not prove sufficient reliance upon the particular false statements that the equipment suppliers had made.
The Court pointed out that the equipment suppliers “had no duty to disclose; and their deceptive acts were not communicated to the public.” Id., at 159. And the Court went on to say that “as a result,” the investors “cannot show reliance upon any” of the equipment suppliers’ actions, “except in an indirect chain that we find too remote for liability.” Ibid. The Court concluded:
“[The equipment suppliers’] deceptive acts, which were not disclosed to the investing public, are too remote to satisfy the requirement of reliance. It was [the cable company], not [the equipment suppliers], that misled its auditor and filed fraudulent financial statements; nothing [the equipment suppliers] did made it necessary or inevitable for [the cable company] to record the transactions as it did.” Id., at 161.
Insofar as the equipment suppliers’ conduct was at issue, the fraudulent “arrangement. . . took place in the marketplace for goods and services, not in the investment sphere.” Id., at 166.
*156 It is difficult for me to see how Stoneridge “support[sj” the majority’s rule. Ante, at 143. No one in Stoneridge disputed the making of the relevant statements, the fraudulent contracts, and the like. And no one in Stoneridge contended that the equipment suppliers were, in fact, the makers of the cable company’s misstatements. Rather, Stoneridge was concerned with whether the equipment suppliers’ separate statements were sufficiently disclosed in the securities marketplace so as to be the basis for investor reliance. They were not. But this is a different inquiry than whether statements acknowledged to have been disclosed in the securities marketplace and ripe for reliance can be said to have been “ma[d]e” by one or another actor. How then does Stone-ridge support the majority’s new rule?
The majority adds that its rule is necessary to avoid “a theory of liability similar to — but broader in application than” — §20(a)’s liability, for “ '[ejvery person who, directly or indirectly, controls any person liable’ for violations of the securities laws.” Ante, at 146 (quoting 15 U. S. C. § 78t(a). But that is not so. This Court has explained that the possibility of an express remedy under the securities laws does not preclude a claim under § 10(b). Herman & MacLean v. Huddleston, 459 U. S. 375, 388 (1983).
More importantly, a person who is hable under § 20(a) controls another “person” who is “liable” for a securities violation. Morrison v. National Australia Bank Ltd., 561 U. S. 247, 253, n. 2 (2010) (“Liability under § 20(a) is obviously derivative of liability under some other provision of the Exchange Act”). We here examine whether a person is primarily liable whether they do, or they do not, control another person who is liable. That is to say, here, the liability of some “other person” is not at issue.
And there is at least one significant category of cases that § 10(b) may address that derivative forms of liability, such as under § 20(a), cannot, namely, cases in which one actor exploits another as an innocent intermediary for its misstate *157 ments. Here, it may well be that the Fund’s board of trustees knew nothing about the falsity of the prospectuses. See, e. g., In re Lammert, Release No. 348, 93 S. E. C. Docket 5676, 5700 (2008) (Janus Management was aware of market timing in the Janus Fund no’ later than 2002, but “[t]his knowledge was never shared with the Board”). And if so, § 20(a) would not apply.
The possibility of guilty management and innocent board is the 13th stroke of the new rule’s clock. What is to happen when guilty management writes a prospectus (for the board) containing materially false statements and fools both board and public into believing they are true? Apparently under the majority’s rule, in such circumstances no one could be found to have “ma[d]e” a materially false statement — even though under the common law the managers would likely have been guilty or liable (in analogous circumstances) for doing so as principals (and not as aiders and abettors). See, e. g., 2 W. LaFave, Substantive Criminal Law § 13.1(a) (2d ed. 2003); 1 M. Hale, Pleas of the Crown 617 (1736); Perkins, Parties to Crime, 89 U. Pa. L. Rev. 581, 583 (1941) (one is guilty as a principal when one uses an innocent third party to commit a crime); Restatement (Second) of Torts §533 (1976). Cf. United States v. Giles, 300 U. S. 41, 48-49 (1937).
Indeed, under the majority’s rule it seems unlikely that the SEC itself in such circumstances could exercise the authority Congress has granted it to pursue primary violators who “make” false statements or the authority that Congress has specifically provided to prosecute aiders and abettors to securities violations. See § 104, 109 Stat. 757 (codified at 15 U. S. C. § 78t(e)) (granting SEC authority to prosecute aiders and abettors). That is because the managers, not having “ma[d]e” the statement, would not be liable as principals and there would be no other primary violator they might have tried to “aid” or “abet.” Ibid.; SEC v. DiBella, 587 F. 3d 553, 566 (CA2 2009) (prosecution for aiding and abetting re *158 quires primary violation to which offender gave “substantial assistance” (internal quotation marks omitted)).
If the majority believes, as its footnote hints, that § 20(b) could provide a basis for liability in this case, ante, at 146, n. 10, then it should remand the case for possible amendment of the complaint. “There is a dearth of authority construing Section 20(b),” which has been thought largely “superfluous in 10b-5 cases.” 5B A. Jacobs, Disclosure and Remedies Under the Securities Law § 11-8, p. 11-72 (2011). Hence respondent, who reasonably thought that it referred to the proper securities law provision, is faultless for failing to mention § 20(b) as well.
In sum, I can find nothing in § 10(b) or in Rule 10b-5, its language, its history, or in precedent suggesting that Congress, in enacting the securities laws, intended a loophole of the kind that the majority’s rule may well create.
II
Rejecting the majority’ s rule, of course, does not decide the question before us. We must still determine whether, in light of the complaint’s allegations, Janus Management could have “ma[d]e” the false statements in the prospectuses at issue. In my view, the answer to this question is “Yes.” The specific relationships alleged among Janus Management, the Janus Fund, and the prospectus statements warrant the conclusion that Janus Management did “make” those statements.
In part, my conclusion reflects the fact that this Court and lower courts have made clear that at least sometimes corporate officials and others can be held liable under Rule 10b-5 for having “ma[d]e” a materially false statement even when that statement appears in a document (or is made by a third person) that the officials do not legally control. In Herman & MacLean, for example, this Court pointed out that “certain individuals who play a part in preparing the registration statement,” including corporate officers, lawyers, and *159 accountants, may be primarily liable even where “they are not named as having prepared or certified” the registration statement. 459 U. S., at 386, n. 22. And as I have already pointed out, this Court wrote in Central Bank that a “lawyer, accountant, or bank, who . . . makes a material misstatement (or omission) on which a purchaser or seller of securities relies may be liable as a primary violator under 10b-5, assuming all of the requirements for primary liability under Rule 10b-5 are met.” 511 U. S., at 191 (some emphasis added).
Given tbe statements in our opinions, it is not surprising that lower courts have found , primary liability for actors without “ultimate authority” over issued statements. One court, for example, concluded that an accountant could be primarily liable for having “ma[d]e” false statements, where he issued fraudulent opinion and certification letters reproduced in prospectuses, annual reports, and other corporate materials for which he was not ultimately responsible. Anixter v. Home-Stake Production Co., 77 F. 3d 1215, 1225-1227 (CA10 1996). In a later case postdating Stoneridge, that court reaffirmed that an outside consultant could be primarily liable for having “ma[d]e” false statements, where he drafted fraudulent quarterly and annual filing statements later reviewed and certified by the firm’s auditor, officers, and counsel. SEC v. Wolfson, 539 F. 3d 1249, 1261 (CA10 2008). And another court found that a corporation’s chief financial officer could be held primarily liable as having “ma[d]e” misstatements that appeared in a form 10-K. that she prepared but did not sign or file. McConville v. SEC, 465 F. 3d 780, 787 (CA7 2006).
One can also easily find lower court cases explaining that corporate officials may be liable for having “ma[d]e” false statements where those officials use innocent persons as conduits through which the false statements reach the public (without necessarily attributing the false statements to the officials). See, e. g., In re Navarre Corp. Securities Litiga *160 tion, 299 F. 3d 735, 743 (CA8 2002) (liability may be premised on use of analysts as a conduit to communicate false statements to market); In re Cabletron Systems, Inc., 311 F. 3d 11, 38 (CA1 2002) (rejecting a test requiring legal “control” over third parties making statements as giving “company officials too much leeway to commit fraud on the market by using analysts as their mouthpieces” (internal quotation marks omitted)); Novak v. Kasaks, 216 F. 3d 300, 314-315 (CA2 2000); Cooper v. Pickett, 137 F 3d 616, 624 (CA9 1997); Freeland v. Iridium World Communications, Ltd., 545 F Supp. 2d 59, 75-76 (DC 2008).
My conclusion also reflects the particular circumstances that the complaint alleges. The complaint states that “Janus Management, as investment advisor to the funds, is responsible for the day-to-day management of its investment portfolio and other business affairs of the funds. Janus Management furnishes advice and recommendations concerning the funds’ investments, as well as administrative, compliance and accounting services for the funds.” Complaint ¶ 18, App. to Pet. for Cert. 65a. Each of the Fund’s 17 officers was a vice president of Janus Management. App. 250a-258a. The Fund has “no assets separate and apart from those they hold for shareholders.” In re Mutual Funds Inv. Litigation, 384 F. Supp. 2d 845, 853, n. 3 (Md. 2005). Janus Management disseminated the Fund prospectuses through its parent company’s Web site. Complaint ¶ 38, App. to Pet. for Cert. 72a. Janus Management employees drafted and reviewed the Fund prospectuses, including language about “market timing.” Complaint ¶31, id., at 69a; In re Mutual Funds Inv. Litigation, 590 F. Supp. 2d 741, 747 (Md. 2008). And Janus Management may well have kept the trustees in the dark about the true “market Liming” facts. Complaint ¶ 51, App. to Pet. for Cert. 80a; In re Lam-mert, 93 S. E. C. Docket, at 5700.
Given these circumstances,. as long as some managers, sometimes, can be held to have “ma[d]e” a materially false *161 statement, Janus Management can be held to have done so on the facts alleged here. The relationship between Janus Management and the Fund could hardly have been closer. Janus Management’s involvement in preparing and writing the relevant statements could hardly have been greater. And there is a serious suggestion that the board itself knew little or nothing about the falsity of what was said. See supra, at 157, 160. Unless we adopt a formal rule (as the majority here has done) that would arbitrarily exclude from the scope of the word “make” those who manage a firm— even when those managers perpetrate a fraud through an unknowing intermediary — the management company at issue here falls within that scope. We should hold the allegations in the complaint in this respect legally sufficient.
With respect, I dissent.